

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-24-1997

# Keller v. Orix Credit Alliance

Precedential or Non-Precedential:

Docket
95-5289

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Keller v. Orix Credit Alliance" (1997). *1997 Decisions*. Paper 264.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/264

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 24, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 95-5289

FREDERICK F. KELLER,
Appellant

v.

ORIX CREDIT ALLIANCE, INC.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

D.C. Civil No. 93-03466

Originally Argued: March 6, 1996

Before: MANSMANN, ALITO, and LEWIS, Circuit Judges

Reargued In Banc: April 16, 1997
Before: SLOVITER, Chief Judge, and
BECKER, STAPLETON, MANSMANN, GREENBERG,
SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, and
MCKEE, Circuit Judges

(Opinion Filed: November 24, 1997)

Edwin M. Baum, Esq. (Argued)
James Robert Pigott, Jr., Esq.
SOLOMON, ZAUDERER,
 ELLENHORN, FRISCHER & SHARP
45 Rockefeller Plaza
New York, New York 10111

Steven L. Lapidus
ROBINSON, LAPIDUS & LIVELI
Two Penn Plaza East
Newark, New Jersey 07105

Attorneys for Appellee

Debra L. Raskin (Argued)
Anne L. Clark
VLADECK, WALDMAN, ELIAS &
 ENGELHARD, P.C.

1501 Broadway
New York, New York 10036

Attorneys for Appellant

OPINION OF THE COURT

ALITO, Circuit Judge:

Frederick F. Keller sued his former employer, ORIX Credit Alliance, Inc., in federal district court, asserting claims under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. S 621 et seq., and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. S 10:5-1 et seq. Keller, who had served as executive vice president and a member of the board of directors, claimed that ORIX Credit Alliance had discriminated against him based on his age when it failed to promote him to the position of chief operating officer and later terminated his employment. The district court granted summary judgment for ORIX Credit Alliance. A panel of this court issued a decision reversing the district court, but ORIX Credit Alliance's petition for rehearing en banc was granted, and we now affirm.

2

I.

A.

Background of the Parties and the Dispute. ORIX Credit Alliance is a subsidiary of companies that are in turn subsidiaries of ORIX Corporation, a Japanese company. App. 385-86, 616. ORIX Credit Alliance is a commercial finance company that is engaged primarily in the business of financing the acquisition or leasing of equipment. Id. at 310. ORIX Credit Alliance generally must borrow the funds needed to support the financing it provides for its customers. Id. In simple terms, the company makes a profit by borrowing funds at one rate and then lending to its customers a higher rate. Id. at 80.

Frederick Keller was born on January 31, 1942. App. 610. After college, he was hired by Franklin National Bank and eventually handled its relationship with Credit Alliance Corporation, ORIX Credit Alliance's predecessor. Id. at 611. In 1976, Credit Alliance Corporation hired Keller as a vice president, and in that capacity he shared the primary responsibility for raising funds for the company. Id. at 612, 1121. Keller obtained funding from banks, helped to supervise "the commercial paper program," and worked on "other sources of funding." Id. at 1120-21. The then-

chairman of the company has described Keller's work as "excellent," and after several years, Keller was promoted to senior vice president of finance. Id. at 614.

In December 1984, First Interstate Bancorp acquired Credit Alliance Corporation's parent company, and Credit Alliance Corporation continued to do business as First Interstate Credit Alliance Corp. App. 613. After this acquisition, First Interstate Bancorp provided most of the funding used by First Interstate Credit Alliance Corp. for its lending activities, and therefore it was no longer necessary for Keller to raise money. Id. at 614. Keller acquired the titles of executive vice president, chief financial officer, and chief credit officer, and he served as a member of the company's board of directors. Id. 70-71, 1121. In 1988, the chairman of the board of First Interstate Credit Alliance Corp. told Keller that he had been considered for the

3

presidency of the company but that Daniel Ryan had been selected. Id. at 1121.

In September 1989, ORIX subsidiaries acquired First Interstate Credit Alliance Corp., which continued to do business under the name of ORIX Credit Alliance. App. at 616. Prior to the acquisition, Keller and six other key executives were requested to sign employment contracts with the new company, and Keller signed a three-year contract for employment at a substantial annual salary. Id. at 616, 644.

After this acquisition, Keller was given the responsibility for raising funding for ORIX Credit Alliance. App. 78. At that time, according to Keller's affidavit, "Credit Alliance had approximately 1.6 billion in debt outstanding to First Interstate Bancorp, 1.3 billion of which was to continue to be provided on a temporary basis. Because it was the goal of Credit Alliance to obtain funding independent of First Interstate Bancorp and of ORIX Corp. or ORIX USA[an ORIX subsidiary] [Keller] determined that it would ultimately be necessary for Credit Alliance to have available credit facilities totaling approximately 1.5 billion dollars." Id. at 616-17 (emphasis added). Keller stated that he communicated this goal to the board of directors at "[m]ore than one meeting." Id. at 15.

Keller's Failure to Meet the $1.5 Billion Goal and His Explanations.  This goal, however, was never met or even approached. Keller himself stated in his deposition that "Credit Alliance never achieved the goal for funding that [he] had communicated to the board of directors." App. 16.

Indeed, he acknowledged that, at all times from September 1989 (the time of the ORIX acquisition) to April 1, 1993 (the time of his termination), funding provided by First Interstate Bancorp and ORIX affiliates constituted more than 50% of ORIX Credit Alliance's funding. Id. at 81-82. In December 1991, $785 million in credit facilities was available to ORIX Credit Alliance. App. 13. By September 1992 -- approximately when the initial decision to terminate Keller was made -- the total available bank lines had dropped to $695 million. Id. at 48. After September 1992, Keller did not secure any increase in bank lines. Id. at 24-25.

4

While Keller does not dispute that he failed to meet or approach the financing goal, he claims that this was due to factors beyond his control. See Appellant's Br. at 8-11, 35-36; App. 617-32 (Keller Affidavit). For example, Keller explained that ORIX Credit Alliance was unable to launch a "commercial paper program," as he had projected, because "there were many obstacles to obtaining a sufficiently high credit rating to permit Credit Alliance to issue and sell commercial paper on favorable terms." App. 618. Among these, he stated, "were the absence of any guarantee by ORIX Corp., and the growing weakness of the Japanese economy which would affect Credit Alliance's parent." Id. Keller summarized these problems in memos that he sent to Ryan. Id.

Keller likewise provides a plethora of reasons for his failure to secure bank lines of credit. He cites the company's credit rating, "the perceived `downturn in the equipment financing industry' . . . [,] Credit Alliance's statistics for `past dues' or untimely payments from its customers and other aspects of its portfolio . . .[,] bank `environment[s] . . . not conducive to risk of any sort' . . .[,] and bank limitations on lending to financing companies . . . or to companies outside a particular geographical area," "the negative impact of the recession in the United States and Japan during the late 1980's and early 1990's and the resulting reluctance of American banks to `book loans,' " and "banks' reluctance to lend to a company having a Japanese parent, given the negative economic situation in Japan at the time." App. 620-21.

During this same period, when Keller was allegedly unable to raise funds by means of a commercial paper program or bank lines of credit, Keller repeatedly expressed opposition to raising funds by "asset-backed securitization," a process that involves the sale of accounts receivable or loan paper to a specially created trust that in turn sells

interests or securities in that trust. See App. 90, 626. Ryan mentioned the possibility of raising funds in this way to Keller before or shortly after the ORIX acquisition (id. at 90), but Keller repeatedly advised Ryan that in his opinion asset-backed securitization was "not for us." Id. at 28-29, 627.

Finally, Keller states that he explored the possibility of private placements of ORIX Credit Alliance debt with insurance companies and other institutional investors. App. 628. But Keller states that it was not until July 1992 (one or two months prior to the decision to terminate him) that he proposed to Ryan that ORIX Credit Alliance Corp. take "[t]he first step" in this direction, i.e., the selection of a bank to act as the company's agent. Id. at 627-28.

ORIX Credit Alliance's Assessment of Keller's Performance. ORIX Credit Alliance points to evidence that paints a picture of growing dissatisfaction within the company about Keller's failure to reach or approach the funding goal. Keller and Ryan both testified that Ryan repeatedly questioned Keller about the funding situation. App. 40, 44, 98-99. Ryan also stated that he asked Keller why ORIX Credit Alliance's competitors were able to obtain forms of financing that his company either did not pursue or allegedly could not obtain. Id. at 90, 92, 98. See also id. at 627 (Keller Affidavit). One of ORIX Credit Alliance's outside directors, David E. Mundell, who had served for nearly 20 years as the president of another leading commercial lending company, stated that at most, if not all, of the board meetings from March 1991 until April 1993 he questioned Keller and "expressed dissatisfaction with the lack of progress in raising funding." Id. at 388. At one meeting, Mundell added, he "expressed the view that, based on [his] knowledge of the equipment finance industry and [his] experience in managing the liability side of finance companies' balance sheets, [he] believed that Credit Alliance was not raising funds in the amounts and on the terms that it should have been able to in light of the relevant factors, such as its financial statements, the sufficiency of its equity, and its status in the industry." Id. Mundell continued that "Keller responded by offering a list of excuses for his inability to raise more funds," but that he "did not . . . make any concrete proposals for correcting the problems that, he claimed, were preventing him from producing the desired results." Id. at 389.

Another outside director, Yoshiaki Ishida, who was also the president and chief executive officer of an ORIX parent corporation, stated that at several board meetings he

"questioned Mr. Keller about his presentation." App. 1164. Ishida added that he "was not satisfied with the results that Mr. Keller reported because the level of funds raised for Credit Alliance was much too low and the goal of independence in funding was not being achieved." Id. Ishida added that he told Ryan at private meetings that "the ORIX parent companies were not happy with the lack of progress in raising funds for Credit Alliance, and with Credit Alliance's continued reliance on another ORIX company (ORIX Ireland) for a large portion of its funding." Id. Ishida also stated that he "told Mr. Ryan, on several occasions, that [he] felt that Mr. Keller's work in raising funds was not satisfactory." Id. at 1165.

In August or September of 1991, still another outside director, Sachio Hata, a senior officer of the parent Japanese corporation, suggested to Ryan that "perhaps [he] was remiss in giving Mr. Keller too much to do and that that could have been the reason why [the company's] financing situation was making such little progress." App. 103. Shortly after Hata made this remark, Ryan relieved Keller of his responsibilities as chief credit officer, primarily so that he "could focus on the financing function." Id.

Keller attempts to counter this evidence by pointing to the absence of proof that Ryan ever expressly "criticized" his performance or disputed his explanations for his inability to obtain various types of funding. Keller points to Ryan's inability during his deposition to recall more than two discussions at board meetings regarding Keller's performance. App. 484-90, 492-93. In addition, Keller points out that, in describing those discussions, Ryan did not mention that either involved a direct criticism of Keller. See Appellant's Br. at 12. Keller also notes that one member of the board of directors, Neil Umhafer, stated that during the period from 1988 to March 1992, "[n]o one challenged or disagreed with Keller's presentations at [board] meetings or suggested in any way that the difficulties he was encountering were in any way due to his performance rather than factors beyond his control."1 App. 1126.

_____

1. ORIX Credit Alliance asserts that Umhafer is now Keller's business partner. Appellee's Br. at 10 n.7; App. 1128. Obviously, however, the question of Umhafer's credibility is not a matter to be considered at the summary judgment stage.

Selection of the New Chief Operating Officer . In about December 1991 -- in the midst of the time when Keller was experiencing difficulty in obtaining funding -- Ryan announced that he planned to retire in approximately two and one-half years from his positions as chairman of the board and chief operating officer of ORIX Credit Alliance. App. 84. Ryan stated that he:

> felt the job required someone that had a deep understanding and background of the company's primary business, someone who had held a line position with the company, preferably someone who had personally performed as many of the tasks that are required to operate the company's business as possible.

Id. at 101. He said that he therefore considered only the two most senior officers from the operational side of the company, division managers Philip Cooper, age 43, and Mark Lasher, age 50. Id. at 101, 268. Keller, then 50 years of age, was not considered even though he had been considered for the position of president in 1988 when Ryan was chosen. Id. at 101. Keller had never held a line position and had never worked in or managed any of the company's branch offices or divisions. Id. at 65, 53.

Cooper was chosen as the new chief operating officer. App. 101. Cooper had decades of experience in line positions managing the company's operations and had been with the company longer than Keller. Id. at 53, 101, 315. In May 1992, Keller, as a member of the board of directors, voted to ratify Cooper's promotion. Id. at 314-15, 345.

The April 13, 1992 Conversation . Keller relies most heavily on a conversation he had with Ryan on April 13, 1992. Keller described this conversation as follows at his deposition:

> [Ryan] assured me that he felt comfortable that Orix would be there for us as far as being able to loan us money. But then [he] made a comment that . . . "We really can't complain if we're not out developing relationships."

8

> He said to me that he didn't see me traveling around the country visiting with banks. He said I was spending a lot of time in New York City.

        * * *

        And then he said . . . "If you are getting too old for the
        job, maybe you should go hire one or two young
        bankers."

App. 27 (emphasis added).

Keller said that, because of Ryan's reference to Keller's
age, Keller prepared a handwritten summary of the meeting
within an hour or two after it ended. App. 25. These
handwritten notes state in pertinent part:

        DNR then suggested that we cannot complain about
        not being able to fund our needs if we have not made
        a good effort to develop lines etc. -- he said I don't see
        you traveling across . . . country developing
        relationships I see you spending a lot of time in NYC.
        He suggested I hire one or two young bankers. Also
        discussed possibility of securitization if necessary.

Id. at 168-69. The handwritten summary contains no
reference to Ryan's alleged words "If you are getting too
old," but Keller explained at the deposition:

        The reason I made those notes in the first place was
        because of that statement, I didn't need these notes to
        remind me of what he said.

Id. at 26.

The Decision to Discharge Keller.  By August or September
1992, Ryan had decided that Keller should be discharged.
App. 91, 1156. After Ryan made his initial decision, he
discussed it with at least four individuals who were
directors or senior officers of the company, and all
expressed agreement. Id. at 1156-57. Those informed
included Mundell, Ishida, Cooper, and Jacob Mehl, an
executive vice president and the general counsel of the
company. Id.

Ryan and Cooper then drew up a list of criteria to be
used in identifying a replacement. App. 316. Among their

primary criteria were "experience in implementing asset-
backed securitization programs and other creative forms of
[fundraising]," "strong skills in working with rating agencies
and bankers, particularly Japanese bankers," and a
"results driven" character. Id. at 316. According to Cooper,

"[t]hese were among the areas in which we felt that Mr. Keller's skills were inadequate for his job at Credit Alliance." Id.

Cooper communicated these criteria to an executive search firm, which subsequently proposed several candidates. App. 316. From among these, Ryan selected Joseph McDevitt, who was born on December 12, 1946, and is thus four years, ten months, and 19 days younger than Keller. Id. at 317, 269, 610.

Keller's Final Months. In September 1992 (i.e., at roughly the time when Ryan made his initial decision to terminate Keller), Ryan began to explore on his own the possibility of obtaining funding by means of asset-based securitization. App. 91. Shortly thereafter, Goldman Sachs & Co. was engaged by Cooper and Ryan for a securitization program, and within two years the company had closed two asset-backed securitization deals and raised nearly $500 million. Id. at 389.

Keller was not informed of Ryan's initial decision to discharge him, App. 590-92, and thus in late 1992 or early 1993 Keller presented to Cooper a one-page document entitled "TIMETABLE FOR DIVERSIFICATION OF FUNDING SOURCES." This plan listed such items as the following:

> 2/8-5/1/93   Meet bankers and gauge level of interest in providing credit facilities.
>
> 2/9/93       Visit S&P; discuss 9-month results; determine feasibility of "A-2" rating before year-end numbers are available. If feasible, set up rating meeting as soon as possible. If not feasible, see below.
>
> 3/15/93      Decide if public securitization is a viable funding source. If so, move to market (90 days).

10

App. 1107. In response to questioning by Keller's attorney, Ryan acknowledged that most, if not all, of these steps were eventually taken, id. at 542-45, but Keller has not pointed to any evidence that any of the steps proposed were novel or that he did much if anything to accomplish any of the objectives.2

Keller was formally discharged by unanimous vote of the executive committee of the board of directors on April 1, 1993, effective on that date. App. 1159, 1162. Ryan went to

Keller's office to inform him of the decision. Id. at 591.
Keller states that the following occurred:

> I asked Dan if he was asking for my resignation
> because of my age and reminded him of the
> conversation that we had in April of `92 when he was
> -- when he asked me if I was getting too old for the job
> and suggested that I, if I were, that I hire one or two
> young bankers to travel around the country. He gave
> me -- there was no response to that, to my comments.

Id. at 593.

Keller subsequently asked to "get together [with Ryan] to
discuss [his] situation" (App. 595), and the two men met for
lunch at a Manhattan restaurant on approximately April 9.
Id. at 595-96. During the lunch, according to Keller, Ryan
stated that Keller's suggestion of a "$1 million plus"
severance package was out of the question, and Ryan
added:

> "Look, you do what you have to do, you know. I have
> discussed this with Jerry Mehl, and he doesn't see that
> we will have a problem."
>
> And then he said, "But, you know, Jerry is a lawyer
> and lawyers aren't always right."

Id. at 597.

McDevitt's Performance.  On April 5, 1993, McDevitt

_____

2. As previously noted, Keller does point to evidence that in July 1992 he
took the "first step" to implement a program of private placement, i.e.,
he
identified the bank that he wanted to serve as the company's agent. App.
628-29.

11

replaced Keller, and within a year he raised well over $1.5
billion in new credit facilities, including almost $2 million
in bank lines, $250 million through a first offering of asset-
backed securities, $275 million through a private
placement of notes, $1 billion in syndicated credit facilities,
and $300 million through the sale of commercial paper.
App. 311-14.

B.

In August 1993, Keller commenced this action in federal

district court, claiming that ORIX Credit Alliance denied him promotion to the position of chief operating officer and ultimately terminated him because of his age, in violation of the ADEA and the NJLAD. ORIX Credit Alliance moved for summary judgment, and the district court granted that motion.

With respect to Keller's discharge claims, the district court first held that Keller had failed to make out a prima facie case under the scheme of proof set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Specifically, the court held that Keller had not identified evidence showing that he was qualified for the position or that he was " `replaced by someone significantly younger to permit an inference of age discrimination.' " Dist. Ct. Op. at 8 (quoting Gray v. York Newspapers, Inc., 957 F.2d 1070, 1088 (3d Cir. 1992)). The court then concluded that, even if Keller had established a prima facie case, ORIX Credit Alliance had proffered a legitimate business reason for Keller's dismissal, namely, "Keller's failure to make adequate progress toward the $1.5 billion independent financing goal," and that Keller had not pointed to evidence that a reasonable jury could view as establishing pretext or as proving that his discharge was due to age discrimination. Id. at 10-11.

With respect to Keller's denial-of-promotion claim, the court reasoned that the same evidence of Keller's failure to meet or approach the financing goal was sufficient to warrant summary judgment on that claim as well. Id. at 11. Keller then took this appeal.

12

II.

We turn first to Keller's discharge claim. Keller contends that this claim should have survived summary judgment under either McDonnell Douglas or Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).

A. McDonnell Douglas

In McDonnell Douglas, the Supreme Court created a special scheme for structuring the presentation of evidence in discriminatory treatment cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. S 2000e-1 et seq. Our court has applied a slightly modified version of this scheme in ADEA cases. See, e.g., Waldron v. SL Industries Inc., 56 F.3d 491, 494-95 (3d Cir. 1995); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.), cert. denied, 115 S.Ct. 2611 (1995); Torre v. Casio, Inc., 42 F.3d 825, 829-30 (3d

Cir. 1994); Healy v. New York Life Ins. Co., 860 F.2d 1209, 1214 (3d Cir. 1988).3 Cf. O'Connor v. Consolidated Coin Caterers Corp., 116 S.Ct. 1307, 1310 (1996) (assuming arguendo that McDonnell Douglas applies under ADEA).

The McDonnell Douglas scheme has three steps. First, the plaintiff must produce evidence that is sufficient to convince a reasonable factfinder to find all of the elements of a prima facie case. St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993). When the plaintiff alleges unlawful discharge based on age, the prima facie case requires proof that (i) the plaintiff was a member of the protected class, i.e., was 40 years of age or older (see 29 U.S.C. S631(a)), (ii) that the plaintiff was discharged, (iii) that the plaintiff was qualified for the job, and (iv) that the plaintiff was replaced by a sufficiently younger person to create an inference of age discrimination. Sempier, 45 F.3d at 728.

If the plaintiff offers sufficient proof of these elements, step two is reached. The burden of production (but not the burden of persuasion) shifts to the defendant, who must

_____

3. Although Keller's complaint grounded his discharge claim on both the federal ADEA and the NJLAD (see App. 4), Keller's brief relies solely on the ADEA with respect to the discharge issue. See Appellant's Br. at 22-39. We therefore confine this portion of our opinion to the ADEA.

then offer evidence that is sufficient, if believed, to support a finding that it had a legitimate, nondiscriminatory reason for the discharge. Hicks, 509 U.S. at 506-07. If the defendant cannot satisfy this burden, judgment must be entered for the plaintiff. Id. at 509. On the other hand, if the defendant does satisfy this burden, step three is reached. The plaintiff may then survive summary judgment or judgment as a matter of law by submitting evidence

> from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). Accord Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc), cert. denied, 117 S.Ct. 2532 (1997).

In this appeal, we find it unnecessary to consider steps one and two of the McDonnell Douglas scheme. Step two is

not contested, and although the parties dispute whether Keller met step one, we will assume for the sake of argument that he did, because we agree with the district court that Keller did not satisfy step three under either the first or second prong of the Fuentes test.

1. Prong One. As noted, a plaintiff may satisfy this prong by offering evidence "from which a factfinder could reasonably . . . disbelieve the employer's articulated legitimate reasons." Fuentes, 32 F.3d at 764. But as we have explained:

> To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence.

Id. at 765. As another court of appeals has put it, "federal courts are not arbitral boards ruling on the strength of `cause' for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is [discrimination]." Carson v. Bethlehem Steel Corp., 82 F.3d 157, 159 (7th Cir. 1996).

The defendant in this case provided evidence that it had a particularly powerful reason for discharging Keller, i.e., his failure to meet or even approach the goal of raising $1.5 billion in financing. As previously noted, ORIX Credit Alliance makes a profit by borrowing money and then lending it at a higher rate. Consequently, borrowed money is the company's life blood, and it thus seems clear (and we do not understand Keller to disagree) that the company would have had a strong reason for discharging a key executive who unjustifiably failed to meet a reasonable objective relating to the raising of funds. Moreover, Keller cannot argue that the objective of raising $1.5 billion was unreasonable when it was originally set: he himself set that goal, and he assured the board of directors that he could meet it.

Instead, Keller makes two chief arguments: first, that the evidence in the summary judgment record shows that his

inability to meet or approach the $1.5 billion objective was due to factors beyond his control and, second, that evidence in the summary judgment record shows that Ryan knew that this was so. We will discuss each of these arguments in turn.

Evidence that Keller's failure to reach or approach the $1.5 million goal was due to factors beyond his control. In considering this argument, it is critical to keep in mind that the question under the first prong of the Fuentes test is not whether "the employer's decision was wrong or mistaken." Fuentes, 32 F.3d at 765. Accordingly, Keller cannot survive summary judgment under this prong simply by pointing to evidence that could convince a reasonable factfinder that he did as well as he could under the circumstances. Rather, he "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a

reasonable factfinder could rationally find them `unworthy of credence.' " Fuentes, 32 F.3d at 765. In simpler terms, he must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason.

When this point is kept in mind, it is apparent that Keller failed to satisfy prong one of Fuentes. Whether Keller could have met or come close to the $1.5 billion goal under the business conditions that prevailed from 1989 to 1992 is a complicated question that would be difficult to resolve without expert testimony of a sort that is lacking in the summary judgment record of this case. But the relevant question is not whether Keller could have done better; instead, the relevant question is whether the evidence shows that it was so clear that Keller could not have done better that ORIX Credit Alliance could not have believed otherwise. The answer to this question is plainly negative.

The evidence relating to asset-backed securitization illustrates the weakness of Keller's position. It is undisputed that Ryan had an early interest in this method of raising funds. Ryan discussed asset-backed securitization with Keller before or shortly after the ORIX acquisition, and it is also undisputed that Keller rejected this idea. Ryan testified without contradiction that on many subsequent occasions he raised the possibility of asset-backed securitization with Keller. Ryan said that every time he read an article in the Wall Street Journal about a competitor's utilization of this technique, he mentioned the subject to Keller, App. 90, and it is undisputed that Keller's

consistent response was that asset-backed securitization should not be pursued by ORIX Credit Alliance, in part because of the nature of its business. Id. at 28. Indeed, Keller's own affidavit reiterates this position. Id. at 626-28. Finally, in September 1992, Ryan decided to explore the matter on his own without Keller's knowledge or participation. Ryan met with leading investment banking firms, engaged the services of one such firm, and within two years the company raised nearly $500 million through two offerings of asset-backed securities. In the face of this evidence, a reasonable factfinder could not find that ORIX Credit Alliance's dissatisfaction with Keller's failure to

pursue asset-backed securitization was so clearly wrong that it cannot have been sincere.

Keller's evidence relating to bank lines of credit likewise falls short of what would be necessary to show that ORIX Credit Alliance's dissatisfaction with his performance was so clearly unfounded that it cannot have been sincere. Keller's brief states:

> [B]anks told Keller that they were not interested in companies outside their region; that their "credit culture [had] bec[o]me very conservative;" that they were troubled by the Japanese economy and the level of delinquent accounts at Credit Alliance, and sought business only with highly rated companies; that they perceived a "downturn in the equipment financing industry . . . which they expect will become even worse."

Appellant's Br. at 10 (footnotes omitted).

This recital is based on four file memos written by Keller during a period of more than three years. See Appellant's Br. at 10 & nn.7-10. The first memo relates that an officer of a regional bank with offices in Florida and Georgia told Keller that his bank "only does business with local companies or national companies with local (Florida/ Georgia) operations." App. 394. The second memo did not report that the bank in question had refused to extend credit; instead, it concluded by saying: "We decided to meet again after [the bank officer] has received and reviewed our 1992 financial information." Id. at 401. The third memo, dated several months after the decision to terminate Keller was made, does recount that an officer at a major bank "repeated his many stories as to why it [was] difficult for him to get a credit facility approved for our company." Id. at 402. The final memo stated that an officer at a major

bank told Keller (in 1990) that "the Bank would prefer to delay providing . . . a line of credit." Id. at 666. Taken together, these file memos and the additional memos cited in Keller's affidavit (see id. at 620-21) constitute evidence from which a reasonable factfinder could conclude that Keller experienced difficulties in securing bank lines, but they could not persuade a reasonable factfinder that it was

so plainly impossible for Keller to secure additional lines of credit from other banks during the 1989-1992 period that ORIX Credit Alliance's dissatisfaction with his performance must not have been real.

We will not discuss the evidence relating to Keller's failure to obtain more funding by other means. However, after examining all of the evidence identified in Keller's brief for the purpose of showing that his failure to meet or approach the $1.5 billion financing goal was due to factors beyond his control, we are convinced that Keller has not shown that it was so plain that he could not have done substantially better under the circumstances that ORIX Credit Alliance could not have truly believed otherwise.

Evidence that Ryan knew Keller could not have done better. Keller also argues in his brief that the summary judgment record contains evidence that Ryan knew that Keller could not have done appreciably better under the business circumstances that prevailed from 1989 through 1992. See Appellant's Br. at 8-9. This argument, however, is simply not supported by the record.

Keller's brief states that "Ryan repeatedly acknowledged" that "Keller's inability to obtain more credit on favorable terms was due to circumstances beyond his control." Appellant's Br. at 35-36. But our review of the record citations provided in Keller's brief has not disclosed a single such acknowledgment. Instead, most of the record citations are based on passages from Ryan's deposition during which the following occurred. Keller's attorney showed Ryan documents that had been written by Keller and that memorialized statements that had allegedly been made by third parties, such as officers of banks or rating agencies, and that explained why these third parties were unwilling to take various actions that would have been favorable to ORIX Credit Alliance. Keller's attorney then asked Ryan whether he had any basis for disputing the accuracy of the documents, and Ryan (who generally had no recollection of previously seeing the documents) said that he had no basis for disputing their accuracy. See Appellant's Br. at 10 & nn.7-10 (citing App. 554-55, 558-59, 561-6, 563-646).

These exchanges merely show that Ryan did not dispute
the accuracy of particular documents that recounted a

limited number of specific statements allegedly made over
the course of several years by individuals associated with
particular banks and rating agencies. A factfinder could not
reasonably draw from these exchanges the general
conclusion that Ryan "repeatedly acknowledged" that
"Keller's inability to obtain credit on favorable terms was
due to circumstances beyond his control." Appellant's Br.
at 35-36.

Keller also relies on the assertion that his performance
was never "criticized" prior to the April 13 meeting with
Ryan, and he argues that this absence of criticism shows
that ORIX Credit Alliance was not sincerely disturbed by
his failure to approach the $1.5 billion goal. Appellant's Br.
at 29, 36. The summary judgment record contains evidence
that Keller was criticized (director Mundell's comments are
perhaps the clearest example), but Keller claims that he
was never "criticized," except at the April 13, 1992 meeting,
and in the present procedural posture of the case, we
accept Keller's position.

Keller does not dispute, however, that he was repeatedly
"questioned" by Ryan and others about this matter, and
therefore the question is to what extent a reasonable
factfinder could infer from the absence of criticism (as
distinct from questioning) that ORIX Credit Alliance was
not really troubled by Keller's failure to approach the $1.5
billion goal. We conclude that a reasonable factfinder could
draw only a relatively weak inference. Employers who are
dissatisfied with the performance of their employees
sometimes voice express criticism to those employees, but
employers do not always do so. See Healy, 860 F.2d at
1216 ("The company is under no obligation to warn plaintiff
of complaints regarding his performance and, if anything,
the effect of such evidence is equivocal, perhaps indicating
that plaintiff was receiving the benefit of the doubt.")
(citation omitted). Evidence that a plaintiff was not
criticized may take on significance if the plaintiff can show
that other comparable employees regularly received express
evaluations of their work, but Keller does not point to any
such evidence. Moreover, in light of the patent importance
of the $1.5 billion goal, and in light of the steady
"questioning" of Keller about this matter, the absence of

explicit criticism cannot reasonably be viewed as having great importance.

In sum, after considering all of the evidence that has been called to our attention, we conclude that a reasonable factfinder could not find that the words, actions, or omissions of the relevant ORIX Credit Alliance officers evidenced their belief that Keller was doing as well as could be expected under the circumstances. For this reason and the others explained above, we therefore hold that Keller cannot defeat summary judgment based on the first prong of the Fuentes test.

2. Prong Two.  Accordingly, we proceed to the question whether Keller can survive summary judgment under prong two of the Fuentes test. Under this prong, Keller must identify evidence in the summary judgment record that "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762. In other words, under this prong, Keller must point to evidence that proves age discrimination in the same way that critical facts are generally proved -- based solely on the natural probative force of the evidence.

Keller's best evidence under prong two is his account of his conversation with Ryan on April 13, 1992. As previously noted, Keller testified that Ryan made the following comments:

> "We really can't complain if we're not out developing relationships."

> He said to me that he didn't see me traveling around the country visiting with banks. He said I was spending a lot of time in New York City. . . .

> And then he said . . . "If you are getting too old for the job, maybe you should hire one or two young bankers."

App. 27 (emphasis added). Although Ryan denied using the words "If you are getting too old for the job," and although Keller's contemporaneous notes of the conversation omit any mention of this phrase, we are required, in reviewing the district court's grant of summary judgment in favor of

20

ORIX Credit Alliance, to accept Keller's account of the conversation.

Ryan's alleged words certainly constitute evidence from which a reasonable factfinder could draw an inference of age-based animus, but we do not think that these words alone could reasonably be viewed as sufficient to prove by a preponderance of the evidence that age was a determinative cause of Keller's subsequent termination. For one thing, the alleged comment occurred four or five months prior to the time when Ryan decided that Keller should be discharged. In addition, the alleged remark did not refer to the question whether Keller should be retained or fired but instead concerned the hiring of other employees to assist him. Furthermore, the alleged statement pertained to only one method of raising funds -- obtaining lines of credit from banks outside New York City by traveling to meet their officers. Even if Ryan's alleged statement is interpreted to mean that he felt that Keller might be getting too old to do the traveling necessary to raise funds in this way, no evidence has been brought to our attention that other methods of raising funds, such as beginning a commercial paper program or utilizing asset-backed securitization, would have required extensive travel.

Keller's remaining evidence under prong two is insubstantial. Keller's statistical evidence is of little if any value.[4] Moreover, we reject Keller's suggestion that Ryan's actions during his meeting with Keller on April 1, 1993, when he asked for Keller's resignation, and his comments during their subsequent restaurant meeting approximately one week later constitute significant evidence of age-based animus.

During the meeting on April 1, 1993, Ryan gave Keller a draft letter of resignation to consider. See App. at 594. Under the terms set out in this letter, Keller would have

_____

4. Keller's brief states: "all six employees at or above the vice president
level whom defendant has let go since September 1989 are over 40, even though 22% of such positions are held by individuals under 40." Appellant's Br. at 7. Without any demonstration of the statistical significance of this data, a factfinder could not reasonably accord it much if any weight.

received certain substantial benefits, including one-half his annual salary plus $50,000. See App. 1114. In return, Keller would have released ORIX Credit Alliance from all claims. Id. at 1115. Noting that this blanket release would have presumably included claims of age discrimination,

Keller seems to imply that the inclusion of this provision in the letter evidences ORIX Credit Alliance's awareness that Keller had grounds for an age-discrimination claim against it. Appellant's Br. at 4. This implication is far-fetched. Without evidence that a request for a blanket release is not a common practice when an executive is asked to resign under terms such as those set out in the letter, the inclusion of this clause in the proposed letter of resignation has little evidentiary worth.

Likewise, we reject Keller's argument that Ryan's comments during the restaurant meeting evidenced consciousness of guilt of age discrimination. See Appellant's Br. at 4, 35. At the April 1, 1993 meeting, Keller had asked Ryan:

> "if he was asking for [Keller's] resignation because of [his] age and [Keller] reminded him of the conversation that [they] had in April of `92 when . . . he asked [Keller] if [he] was getting too old for the job and suggested that . . . if [he] were, that [he] hire one or two young bankers.

Id. at 593. At his deposition, Ryan stated that he assumed, based on Keller's comment, that Keller "was thinking of an age discrimination suit." Id. at 512-13. At the subsequent restaurant meeting, after rejecting Keller's request for a "$1 million plus" severance package, Ryan said:

> Look, you do what you have to do . . . I have discussed this with Jerry Mehl [the ORIX Credit Alliance general counsel] and he doesn't see that we will have a problem . . . [b]ut, you know, Jerry is a lawyer and lawyers aren't always right.

Id. at 597.

Referring to these events, Keller's brief states:

> Ryan's comments that Credit Alliance could be found liable for age discrimination are evidence that, at a

22

> minimum, he indeed had made the biased statement Keller attributed to him.

Appellant's Br. at 4. Keller further argues that evidence of age discrimination is provided by "Ryan's statements at the time of Keller's discharge that he assumed that Keller would sue for age discrimination." Appellant's Br. at 35 (footnote omitted). These arguments have no merit.

When Keller asked at the April 1, 1992 meeting whether he was being fired because of his age, any reasonable person would have realized that Keller might thereafter sue for age discrimination. Thus, Ryan's assumption that Keller might file such a suit hardly constitutes evidence of consciousness of guilt.

Furthermore, Ryan's statement that his company's general counsel might turn out to be wrong in predicting that Keller's termination would not cause a "problem" has little if any evidentiary value to show that Ryan believed that Keller had a meritorious age-discrimination claim. Needless to say, even an ultimately unsuccessful claim may constitute a "problem," and due to the vagaries of the legal process, unmeritorious suits are not always unsuccessful (just as meritorious suits do not always succeed).

In assessing whether the proof in this case is sufficient to establish by a preponderance of the evidence that age was a determinative cause of Keller's termination, a reasonable factfinder would have to consider, in addition to the evidence noted above, the proof underlying the elements of the prima facie case. Thus, a reasonable factfinder would have to weigh the fact that Keller, who was 51 years old when fired, was replaced by a man who was about four years and ten and one-half months younger.

Finally, a reasonable factfinder would also have to consider the evidence, which we discussed in part IIA1 of this opinion, that ORIX Credit Alliance had a powerful, legitimate reason for discharging Keller, namely, his failure to meet or even approach the critical $1.5 billion goal that he himself had set. A reasonable factfinder would have to ask whether a company like ORIX Credit Alliance was more likely to be concerned about Keller's failure to raise these

funds or about replacing him with a man who was some four years and ten and one-half months younger.

Considering all of the evidence that is relevant with respect to prong two, we conclude that a reasonable factfinder could not find that the proof is sufficient to establish by a preponderance of the evidence that age was a determinative factor in Keller's termination. Consequently, we hold that Keller cannot survive summary judgment under prong two of the Fuentes test. Since we have already held that he failed under prong one as well, it follows that he cannot defeat summary judgment under the scheme of proof set out in McDonnell Douglas.

B. Price Waterhouse

We therefore move on to Keller's argument that he was
entitled to survive summary judgment under Price
Waterhouse. Under Justice O'Connor's controlling opinion
in Price Waterhouse, if a plaintiff "show[s] by direct evidence
that an illegitimate criterion was a substantial factor in the
decision," the burden of persuasion shifts to the employer
"to show that the decision would have been the same
absent discrimination." 490 U.S. at 276 (O'Connor, J.
concurring) (emphasis added). See Armbruster v. Unisys
Corp., 32 F.3d 768, 778 (3d Cir. 1994). The precise
meaning of Justice O'Connor's term "direct evidence" has
divided the courts. See Linda Hamilton Krieger, The Content
of Our Categories: A Cognitive Bias Approach to
Discrimination and Equal Employment Opportunity, 47 Stan.
L. Rev. 1161, 1220-21 (1995) (describing the varying
approaches of the circuits); Note, Despite the Smoke, There
Is No Gun: Direct Evidence Requirements in Mixed-Motives
Employment Law After Price Waterhouse v. Hopkins, 46
Stan. L. Rev. 959, 970-79 (1994) (same). Similarly, when
the present case was before the panel, the majority and the
dissent disagreed on the question whether Ryan's alleged
statement on April 13, 1992, constituted "direct evidence"
within the meaning of Price Waterhouse.

On reconsidering this case en banc, we conclude that it
is not necessary for us to resolve this question. We have
held in part IIA2 of this opinion that a reasonable jury

24

could not find by a preponderance that age was a
determinative factor. If we held that Keller provided "direct
evidence" within the meaning of Price Waterhouse, Keller
could avoid summary judgment only if a reasonable jury
could fail to find by a preponderance that age was not a
determinative factor. Here, for the reasons explained above
in part IIA2 of this opinion, a reasonable factfinder could
not fail to find by a preponderance that age was not a
determinative factor in Keller's termination. We therefore
hold that Keller cannot survive summary judgment on his
discharge claim under Price Waterhouse.

III.

We proceed finally to Keller's claim that ORIX Credit
Alliance failed to promote him to the position of chief
operating officer in May 1992 because of his age. Assuming
for the sake of argument that Keller could make out the
elements of a prima facie case with respect to this

promotion decision, we hold that ORIX Credit Alliance proffered a legitimate explanation for the decision and that Keller did not satisfy either prong one or two of the Fuentes test.5

Ryan explained that he felt that the job of chief operating officer "required someone [who] had a deep understanding and background of the company's primary business, someone who held a line position with the company, preferably someone who had personally performed as many of the tasks that are required to operate the company's business as possible." App. 101. Keller has not pointed to any evidence showing that ORIX Credit Alliance did not in fact rely on this criteria in choosing the new chief operating officer. Nor has Keller pointed to any evidence that he

_____

5. Although Keller relies on the NJLAD with respect to his failure-to-promote claim, the relevant legal principles are the same as those applicable under the ADEA. See McKenna v. Pacific Rail Serv., 32 F.3d 820 (3d Cir. 1994) (predicting New Jersey Supreme Court would follow Hicks); Grigoletti v. Ortho Pharmaceutical Corp., 570 A.2d 103 (N.J. 1990) (McDonnell Douglas scheme applies under LAD); Burke v. Township of Franklin, 619 A.2d 903 (N.J. Super. Ct. App. Div. 1993) (looking to ADEA in interpreting LAD).

possessed such experience. Furthermore, the selection of the new chief operating officer came at a time when Keller was failing in the performance of the job he then held. Months earlier, he had been relieved of his responsibilities as chief credit officer so that he could focus on raising funds, and by May 1992, it is undisputed that Keller was being repeatedly questioned about his failure to meet or approach the $1.5 billion target. Under these circumstances, it is apparent that the company had legitimate reasons for failing to promote Keller to the top position of chief operating officer. Thus, Keller failed to satisfy prong one of the Fuentes test.

We likewise hold that Keller failed to meet prong two of that test. We have already discussed all of the evidence on which Keller relies to show age discrimination, and we will therefore not discuss that evidence again here. Considering all of that evidence, and keeping in mind that Ryan's alleged comment on April 13, 1992, came only a few weeks before the promotion decision was made, we nevertheless conclude that the evidence is insufficient to convince a reasonable factfinder by a preponderance that age was a determinative factor in the promotion decision.

IV.

For the reasons explained above, we therefore affirm the decision of the district court granting summary judgment in favor of ORIX Credit Alliance on all of Keller's claims.

26

ROTH, J. concurring and dissenting:

I join in all parts of the majority opinion except for Part II.B. I do not believe that we can avoid resolving the question of whether Ryan's alleged statement on April 13, 1992, constituted "direct evidence" within the meaning of Price Waterhouse. In avoiding this question, the majority is by necessity deciding something. First of all, it is deciding that "direct" evidence may be of such little probative value that it need not rise to the level of creating a material issue of fact or of preventing a grant of summary judgment in favor of the defendant. If such a decision were not implicit in the majority's conclusion in Part II.B, the majority would have not been able to affirm the district court's granting of summary judgment in a case in which there is the possibility that "direct evidence" has been proffered by the non-moving plaintiff. I do not consider that "direct evidence" could be of such little probative value that, if it were present in any given case, it would be sufficient to be classified as "direct" but not sufficient to prevent summary judgment.

A second implied determination that can be read into Part II.B is that "direct evidence" may be determined by reviewing all the evidence that will be presented to the fact finder. I am troubled by the breadth of such a holding. Moreover, I am not sure that it can be read to follow from Justice O'Connor's statement in Price Waterhouse . I would conclude instead that, when Ryan's April 13 remark is viewed in the context in which it was made and in light of the possible ambiguities inherent in the language he used, his statement is not "direct evidence."

A third assumption that I can draw from the reasoning of Part II.B is that the majority arrived at the decision that it did in Part II.A.2 only by, in essence, determining that Ryan's April 13 remark was not "direct evidence" of discrimination. If that is so, then why not say so.

27

LEWIS, Circuit Judge, dissenting.

The Age Discrimination in Employment Act makes it unlawful to "discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. S 623(a)(1). Like other employment discrimination claims, claims under the ADEA can be established either by the presentation of direct evidence of discrimination under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), or of evidence which creates an inference of discrimination under the framework of McDonnell Douglas-Burdine.

The sum of Keller's argument on appeal is that there is sufficient evidence in this case to withstand a motion for summary judgment under either approach. The majority disagrees, finding that while that may be the sum, it carries little substance. Instead, the majority concludes that the evidence is insufficient to convince a reasonable factfinder that Credit Alliance discriminated against Keller based on his age. For the reasons which follow, I respectfully dissent.

I. MIXED MOTIVE UNDER PRICE WATERHOUSE

As we have said, when an employee presents evidence supporting a reasonable inference that a decisionmaker relied upon an illegitimate criterion, summary judgment for the employer is not appropriate. Weldon v. Kraft , 896 F.2d 793, 797 (3d Cir. 1990); Hankins v. Temple University, 829 F.2d 437, 440 (3d Cir. 1987).

> A plaintiff who makes such a case in resisting the defendant's motion for summary judgment does not need the help of McDonnell Douglas to resist the motion. He walks as it were without crutches. For he has presented enough evidence to defeat a motion for summary judgment under the general test for the grant of such a motion . . . .

Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990). We have recognized that "[w]hen direct evidence is available, problems of proof are no different than in other civil cases." Goodman v. Lukens Steel Company, 777 F.2d

28

113, 130 (3d Cir. 1985) (citation omitted). The issue becomes whether the employer did in fact rely upon the illegitimate criterion, which "is precisely the sort of question which must be left to the jury." Siegel v. Alpha Wire Corp., 894 F.2d 50, 55 (3d Cir. 1990).

In my view, Keller provided evidence which reflects a discriminatory animus on the part of a person involved in the decisionmaking process. As the majority notes, Keller testified that during the first meeting in which he was ever criticized about his job performance, Ryan specifically stated, "If you are getting too old for the job, maybe you should hire one or two young bankers."6

I believe that Ryan's statement is sufficient evidence of a discriminatory animus under Price Waterhouse. First, as CEO of the company, Ryan is clearly a decisionmaker, and in this case has admitted that he was the principal decisionmaker in firing Keller. Second, it seems rather obvious that Ryan's suggestion that Keller may be getting too old to perform his job properly and that he hire younger bankers could reflect a discriminatory animus on the basis of age. Such a comment, if true, is by no means shrouded in ambiguity, and there is no evidence to suggest that it was stated facetiously. In addition, the comment was made during a conversation about Keller's performance. According to Keller, the comment was made at the meeting in which he was first informed that his performance was considered unsatisfactory. I believe, therefore, that a reasonable factfinder could conclude that the comment was related to the decisionmaking process itself. As the majority notes, Ryan was critical of Keller's performance at the time this alleged comment was made. Majority Opinion at 16-17.

_____

6. The majority concludes that the "too old" comment is insufficient proof of age-based animus because it occurred "four or five months" prior to the discharge decision and only pertained to one aspect of Keller's duties. Majority Opinion at 20-21. While this is certainly a powerful argument, it is an interpretation which goes to the weight of the evidence, and is a question for the finder of fact. Shager v. Upjohn Co., 913 F.2d 398, 402 (7th Cir. 1990) ("[T]he task of disambiguating ambiguous utterances is for trial, not for summary judgment. On a motion for summary judgment the ambiguities in a witness's testimony must be resolved against the moving party.").

29

Since Ryan decided to fire Keller only a few months later, the age-related comment is probative of the factors considered in Ryan's decision to terminate Keller. See Robinson v. PPG Indus. Inc., 23 F.3d 1159, 1165 (7th Cir. 1994) (holding that comments about the company not keeping employees on until they reached sixty-five could not be considered stray remarks for the purposes of summary judgment); Shager, 913 F.2d at 400-02 (holding that comments including "These older people don't much like or much care for us baby boomers, but there isn't

much they can do about it," constituted direct evidence at the summary judgment phase).

I do not consider this comment a stray remark, insufficient as direct evidence of discrimination, simply because it was the only age-related remark Keller could recall. Just as there are "no talismanic expressions which must be invoked as a condition-precedent to the application of laws designed to protect against discrimination," there is also no specific frequency with which discriminatory remarks must be expressed before our protective laws are triggered. Aman v. Cort Furniture Rental Corporation, 85 F.3d 1074, 1083 (3d Cir. 1996). The key inquiry is not the number of times a comment is made but the context in which it is made.

If the single comment is made by a decisionmaker and reflects a discriminatory animus toward the plaintiff in the decisionmaking process, it might well constitute direct evidence of discrimination. See Price Waterhouse, 490 U.S. at 241 ("The critical inquiry . . . is whether[the illegitimate criterion] was a factor in the employment decision . . . ."). Unlike hostile environment claims, Price Waterhouse considers only the nature and probative value of the alleged discriminatory comment, and not the frequency with which it was stated, because an employer's "[r]eliance on [illegal] factors is exactly what the threat of Title VII liability was meant to deter." Id. at 265 (O'Connor, J., concurring). As discussed above, the alleged age-related remark in this case was made by the principal decisionmaker during his critique of Keller's work performance, and could be interpreted as reflecting a negative attitude toward his age. See Robinson, 23 F.3d at 1165 (holding that potentially age-

30

related comments made by the supervisor who decided to terminate the plaintiff were sufficient direct evidence of discrimination to survive summary judgment).

As we have stated, since "discriminatory comments by an executive connected with the decisionmaking process will often be the plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant . . . ." Abrams v. Lightolier Inc., 50 F.3d 1204, 1215 (3d Cir. 1995). Since Keller presented evidence which could allow a factfinder to conclude that Ryan relied on an illegitimate criterion in making his employment decision, I believe that summary judgment was inappropriate. Given this evidence, Credit Alliance's proffered legitimate reason for discharging Keller simply creates a material issue of fact, rather than demonstrating the absence of one.

II. PRETEXT UNDER MCDONNELL DOUGLAS-BURDINE

Since the majority assumes that Keller has presented a prima facie case, I will next address whether the evidence presented is sufficient to survive summary judgment under Fuentes v. Perskie, 32 F.3d 759 (3d Cir. 1994).

A. Evidence Supporting An Inference of Discrimination

Under the McDonnell Douglas-Burdine framework, I believe Keller has offered sufficient evidence which could support a finding that Credit Alliance's proffered explanation is pretext and therefore creates a material issue of fact as to the credibility of that explanation.

1. Evidence of Discrimination

We have consistently held that a plaintiff who has made out a prima facie case can defeat a motion for summary judgment by "adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 764. Evidence of age-based comments made by a supervisor, therefore, could support an inference that the termination decision was made because of the plaintiff's age. Abrams, 50 F.3d at 1214; Torre v. Casio, Inc., 42 F.3d 825, 834 (3d Cir. 1994);

31

Armbruster v. Unisys Corp., 32 F.3d 768, 783 (3d Cir. 1994).

> Indeed, we have held that discriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination. [See] Roebuck v. Drexel University, 852 F.2d 715, 733 (3d Cir. 1988) (upholding admissibility of discriminatory comment by decisionmaker made five years before denial of tenure).

Abrams, 50 F.3d at 1214 (citation omitted). When combined with Keller's prima facie case, Ryan's suggestion that perhaps Keller was getting "too old" for the job, and that he should hire some "young bankers" could clearly support an inference of discrimination.

This conclusion is supported by our prior decisions. In Roebuck, we concluded that the comment that "in terms of comparable white faculty members . . . blacks would cost

Drexel more money to hire those black faculty members," could give rise to an inference of discrimination even when made five years before the decision in question. 852 F.2d at 733. Similarly, in Waldron v. SL Industries, Inc., we found that when combined with the plaintiff 's prima facie case, a comment that he should lose some weight because it would make him healthier and look younger, made five months before the termination, could support the conclusion that age was more likely than not a determinative factor. 56 F.3d 491, 502 (3d Cir. 1995). Likewise, an inference of discrimination was evident in Abrams, given comments like "things would hum around here when we got rid of the old fogies," and the fact that two older employees were referred to as "a dinosaur" and "the old men." 50 F.3d at 1214. Finally, in Torre, we found that the statement "did you forget or are you getting too old, you senile bastard?" could reasonably lead to an inference of age-based discrimination. 42 F.3d at 834. See also Robinson, 23 F.3d at 1165; Shager, 913 F.2d at 402-03.

I must note that the fact Keller was replaced by an individual roughly five years his junior should not and does not impair Keller's ability to maintain a claim under the

32

ADEA. Whether the age gap is five years or twenty-five years is irrelevant. See O'Connor v. Consolidated Coin Caterers Corporation, 116 S. Ct. 1307, 1310 (1996) (holding that a plaintiff need not be replaced by someone outside the protected class to maintain a claim under the ADEA). The district court thus erred in holding that Keller had to present evidence that he was "replaced by someone significantly younger to permit an inference of age discrimination." Majority Opinion at 12 (quoting District Court Opinion at 8). I recognize that the majority's opinion does not affirm this particular holding of the district court, but I am troubled that it also does not explicitly disavow the holding. Because of the importance of this point, and for purposes of clarity in future cases, the inclusion of such a disclaimer in the majority's opinion would have been appropriate, as I will explain below.

The Supreme Court has held that there is no particular age difference that must be shown to maintain a claim of age discrimination. See O'Connor, 116 S. Ct. at 1310; see also Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995). In other words, "[t]here is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination." Barber v. CSX Distribution Servs., 68 F.3d 694, 699 (3d Cir. 1995). As we have noted, "[d]ifferent

courts have held, for instance, that a five year difference can be sufficient but that a one year difference cannot." Sempier, 45 F.3d at 729 (citing Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981) and Gray v. York Newspapers, Inc., 957 F.2d 1070, 1087 (3d Cir. 1992)). See also Corbin v. Southland Int'l Trucks, 25 F.3d 1545, 1550 (11th Cir. 1994) (finding evidence of pretext when a 53 year-old was treated more favorably than a 58 year-old employee). In order to survive summary judgment, the evidence need only provide a basis for a reasonable factfinder to conclude that a discriminatory animus was at play in the employer's decision. O'Connor, 116 S. Ct. at 1310. Accordingly, the "replacement by even an older employee will not necessarily foreclose . . . proof if other direct or circumstantial evidence supports an inference of discrimination." Douglas v. Anderson, 656 F.2d 528, 533 (9th Cir. 1981) (emphasis added). In fact, the Tenth Circuit,

in Greene v. Safeway Stores, Inc., 98 F.3d 554, 557 (10th Cir. 1996), reversed a grant of summary judgment as to an ADEA claim even though the replacement was five years older than the plaintiff.

Beyond the context of age discrimination, other courts of appeal have been cognizant of the fact that an employer can act with a discriminatory animus even when replacing a discharged employee with a member of the same protected class. In Carson v. Bethlehem Steel Corporation, 8 F.3d 157 (7th Cir. 1996), the district court had concluded that the fact that Carson, who was white, was replaced by a white employee prevented her from establishing a prima facie case of discrimination. The court of appeals for the Seventh Circuit rejected this conclusion, observing that,

> [The Supreme Court's opinion in] O'Connor v. Consolidated Coin Caterers Corp., ___ U.S. ___, 116 S. Ct. 1307, 134 L.Ed.2d 433 (1966), shows that this understanding of a prima facie case is erroneous. The Court held in O'Connor that the plaintiff in an age discrimination suit need not show that he was replaced by a person outside the protected class. Laws against discrimination protect persons, not classes, the Court remarked, an observation with equal force in a case under the Civil Rights Act of 1964.

Id. at 158.

The court then illustrated the point with the following hypothetical:

Suppose an employer evaluates its staff yearly and retains black workers who are in the top quarter of its labor force, but keeps any white in the top half. A black employee ranked in the 60th percentile of the staff according to supervisors' evaluations is let go, while all white employees similarly situated are retained. This is race discrimination, which the employer cannot purge by hiring another person of the same race later.

Id.

In the same vein, another court has noted that replacement with a protected class member does not negate

34

a discriminatory animus if the employer is "less tolerant of indiscretions committed by black employees than of those committed by whites." Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1186 n.1 (11th Cir. 1984) (citing McDonald v. Santa Fe Trail Transportation Company, 427 U.S. 273, 282-83 (1976)). Significantly, the Nix court also noted that replacement with another member of the same class may serve as "a pretextual device, specifically designed by [the employer] to disguise its act of discrimination toward [the discharged employee.]" 738 F.2d at 1186 n.1 (quoting Jones v. Western Geophysical Co. Of America, 669 F.2d 280, 284 (5th Cir. 1982)). In fact, in the racial context, replacement with another member of the protected class often enables an employer to mask discriminatory motives while realizing racist ideals and stereotypes. The replacement of darker-skinned black employees with lighter-skinned black employees occurs every day in this country in the hope of making white co-workers and customers more "comfortable." Similarly, we all know that the replacement of one woman with another who more closely resembles a traditional conception of the so-called "feminine ideal," in terms of physical appearance, demeanor, (lack of) assertiveness, etc., is not some abstract theory; it is reality, and it happens every day, in business, in the media, and even in our esteemed profession.

In all of these cases, a discriminatory animus can be present even though the replacement is of the same protected class as the discharged employee. The majority declines to acknowledge that a replacement's "race, sex, or age may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition." Carson, 82 F.3d at 159 (citations omitted); see also Nieto v. L&H Packing Company, 108 F.3d 621, 624 n.7 (5th Cir. 1997) (fact that Hispanic employee's replacement was also

Hispanic does not preclude "possibility that the discharge was motivated [by] discriminatory reasons"); Monette v. Electronic Data Systems Corporation, 90 F.3d 1173, 1185 n.11 (6th Cir. 1996) (disabled employee need not show replacement is non-disabled to present prima facie case of discrimination). But as the Supreme Court has emphasized, "[t]he fact that one person in the protected class has lost out to another person in the protected class is . . .

irrelevant, so long as he has lost out because of[an illegal criterion]." O'Connor, 116 S. Ct. at 1310. An employer does not have "license to discriminate against some employees on the basis of race or sex [or age] merely because he favorably treats other members of the employees' group." Connecticut v. Teal, 457 U.S. 440, 455 (1982).

We have already recognized instances of age discrimination in the absence of a considerable age gap between the discharged employee and the replacement. In Sempier, for example, we found that the plaintiff had presented evidence from which a factfinder could "reasonably conclude that [an] employment decision was made on the basis of age" even though the replacement was only four years younger. 45 F.3d at 729. Without deciding whether four years alone was enough, we concluded that the four year difference, combined with the fact that the plaintiff 's functions were also temporarily transferred to someone well over ten years younger, were sufficient to support an inference of age discrimination. Id. at 730.

I believe that the approximate five year age difference between Keller and his replacement, particularly when combined with Ryan's age-based comment, is sufficient to establish an inference that Keller's age was a motivating factor in Credit Alliance's decision. Given Keller's experience, and the fact that the age difference spans chronological decades, so to speak (Keller was in his "fifties" while his replacement was in his "forties"), a factfinder could reasonably conclude age was a determinative factor in the decision to fire Keller. See Pace v. Southern Ry. System, 701 F.2d 1383, 1387 (11th Cir. 1983) ("Seldom will a sixty year-old be replaced by a person in the twenties. Rather the sixty-year-old will be replaced by a fifty-five year-old, who, in turn, is succeeded by someone in the forties, who also will be replaced by a younger person."). The precise gap in age between Keller and his replacement is less relevant than the overall impression presented by the evidence that Credit Alliance used age as a determinative factor in making its decision. See O'Connor, 116 S. Ct. at 1310 (stating "irrelevant factor[s]" should not

take precedence over "evidence adequate to create an inference that an employment decision was based on a[n]

[illegal] discriminatory criterion"). Since Keller produced evidence which could support the conclusion that age was more likely than not a motivating factor in Ryan's decision to terminate him, Credit Alliance's proffered reason merely creates a material issue of fact.

In sum, while I agree with the majority that the narrowness of the age gap between Keller and his replacement is a factor a reasonable factfinder would have to consider, I do not agree that "the gap" does not permit a reasonable inference of discrimination.

2. Evidence That the Employer's Proffered Reason Is Not Worthy Of Credence

A plaintiff in an employment discrimination case may also defeat a motion for summary judgment by presenting evidence from which a reasonable factfinder could conclude that the defendant's proffered justifications are not worthy of credence. Torre, 42 F.3d at 832; Fuentes, 32 F.3d at 764 (legal principle reaffirmed in Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc)). Credit Alliance's proffered reason for terminating Keller was his failure to make adequate progress toward achieving their financing goal. Credit Alliance argues, and the majority concludes, that Keller's evidence is aimed at simply demonstrating that this decision was wrong because, according to Keller, it was impossible to reach the goal. Majority Opinion at 15-17. This conclusion misinterprets both the evidence and Keller's argument.

Keller is not arguing that the proffered reason is pretextual because it is wrong. He is arguing that Credit Alliance was aware of the outside factors that hindered his ability to obtain funding, and that they did not fault him for the results of his efforts.

While pretext is not demonstrated by showing that the employer was mistaken, Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1993), it can be established by "evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reason." Sempier, 45 F.3d at 731 (citing Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)) (emphasis added). The thrust of the evidence

and Keller's argument is that Credit Alliance was not dissatisfied with his performance, because it knew that efforts to obtain outside fundraising were impeded by various market forces.

Keller relies upon evidence which could establish: (1) that Credit Alliance's disappointing progress was due to forces beyond his control; (2) that Credit Alliance recognized that fact; and (3) that it knew that this poor showing was not attributable to him. Seen in the light most favorable to Keller, I think it is clear that a reasonable jury could consider Credit Alliance's explanation that Keller was fired for "poor performance" pretextual. See Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987) (reversing summary judgment when the plaintiff proffered evidence "that his supervisors realized that the poor results were not his fault [and that the] testimony of the movant's witnesses was inconsistent regarding whether they believed [plaintiff]'s performance caused the unsatisfactory job results"). See also Rhodes v. Guiberson Oil Tools, 75 F.3d 989, 996 (5th Cir. 1996) (en banc) (holding that there was sufficient evidence to support a finding of discrimination when the plaintiff demonstrated that the employer's proffered explanation of poor performance was pretextual because his poor results were due to the company's prices and a poor customer base); Johnson v. Group Health Plan, Inc., 994 F.2d 543, 546 (8th Cir. 1993) (report stating that morale problems caused by other factors created factual issue regarding plaintiff 's performance); Mastrangelo v. Kidder, Peabody & Co., 722 F. Supp. 1126, 1134 (S.D.N.Y. 1989) (finding sufficient evidence showing defendant's criticism of plaintiff 's performance was pretextual where problems of his department were attributable, at least in part, to matters beyond his control).

Furthermore, unlike the majority, I believe the absence of any criticism of Keller's performance would permit a reasonable factfinder to disbelieve Credit Alliance's proffered explanation. The majority unnecessarily complicates the analysis by requiring Keller to show that "other comparable employees" received evaluations of their work. Majority Opinion at 19. Regardless of Credit Alliance's general evaluative practices, I find it difficult to

38

conceive of an employee's work being so inadequate as to warrant termination but not so poor as to warrant some criticism before the point of termination. Indeed, we have

generally confined our analysis to an employer's evaluation of the discharged employee, not an employer's general practice of assessing employee performance. In Sempier, for example, we concluded that a genuine issue existed as to pretext because of the plaintiff 's own testimony of satisfactory performance combined with evidence that he was not criticized while still employed. 45 F.3d at 731-32.

To justify firing Keller, the only evidence offered by Credit Alliance is the post-hoc deposition testimony of some of the members of the board of directors who ratified the decision to fire Keller. With the exception of Ryan's testimony and a purported comment made after Ryan decided to fire Keller, much of the evidence is ambiguous as to whether the statement represented criticism. For the most part, Credit Alliance asks us to infer that questions about the progress of the fundraising were criticisms of Keller's performance. For example, Credit Alliance points to the fact that one of its outside directors suggested that Keller be relieved of his duties as Chief Credit Officer so he could concentrate on raising funds, and asks that we consider this suggestion a "criticism" of Keller's performance. However, we cannot draw such an unwarranted inference at the summary judgment phase, particularly in view of the fact that Keller offered evidence that when questioned about the progress, the board accepted his explanation that difficulties in the U.S. and Japanese economies made it difficult to secure funding on terms more favorable than the terms provided by their current source.

Finally, the majority improperly relies on events which occurred after Keller was fired. The majority suggests that Credit Alliance's ability to raise nearly $500 million using asset-backed securitization, the technique eschewed by Keller, indicates that its dissatisfaction with Keller's work was sincere. Majority Opinion at 16-17. However, this tactic did not prove successful until after Keller's discharge so it should not have any bearing on the determination of whether Credit Alliance acted with a discriminatory animus. "The employer could not have been motivated by

knowledge it did not have, and [therefore] it cannot . . . claim that the employee was fired for the nondiscriminatory reason." McKennon v. Nashville Banner Publishing Co., 513 U.S. 352, 360 (1995).

It is also true that Keller's performance subsequent to Ryan's decision to terminate him is relevant for establishing pretext. Ryan testified that if Keller had come up with a plan and demonstrated some success in achieving it, he

(Ryan) might have changed his mind. Keller provided evidence to demonstrate that he had done the preliminary work on some, if not all, of the means of financing that later proved to be successful. In particular, Keller points to evidence that he formulated a plan to achieve Credit Alliance's financing goal. In deposition testimony, Ryan admitted that the steps outlined in the plan provided by Keller were the ones followed by Credit Alliance in successfully raising funds in 1993 and 1994. Also, Keller successfully secured the $100 million private placement that was the first step in improving Credit Alliance's credit rating. Despite Keller's plan and demonstration of success, however, Ryan terminated him. A jury could conclude that Keller played a significant role in Credit Alliance's subsequent attainment of its funding goal, and that Credit Alliance's claim of poor performance, therefore, was pretextual.

Given this evidence, there is a material issue of fact as to whether Credit Alliance recognized the economic problems associated with the fundraising and therefore whether Keller's performance was the reason for his discharge. If a factfinder were to accept Keller's evidence and interpretation of that evidence, it could reasonably conclude that Credit Alliance did not in fact fire him based upon any dissatisfaction with his ability to raise financing. The factfinder could then further conclude that Keller was terminated because of his age. Fuentes, 32 F.3d 759, 764. As material issues of fact remain in dispute, summary judgment in favor of Credit Alliance is inappropriate.

III. FAILURE TO PROMOTE

Credit Alliance argues that Keller has not demonstrated that he was qualified for the position of Chief Operating

40

Officer, did not apply for the position, and that he is estopped from asserting a discrimination claim because as a member of the board of directors he voted for Copper's appointment. I believe that there is sufficient evidence in the record for Keller's failure to promote claim to survive summary judgment. First, Keller clearly established that he was qualified for the position of Chief Operating Officer. In reviewing qualifications, we must only look to objective criteria, such as Keller's education and experience. See Weldon, 896 F.2d at 798. Second, Keller correctly argues that he was not required to apply for the position. See Carmichael v. Birmingham Saw Works, 738 F.2d 1126, 1133 (11th Cir. 1984) (holding plaintiff can maintain claim of discrimination, without having applied for job, if

employer "had some reason or duty to consider him for the post"). Keller's senior management position, his prior consideration for the position of President of Credit Alliance, and Ryan's knowledge that Keller was interested in the Chief Operating Officer position are sufficient to establish a prima facie case as to this claim.

I do not believe that Credit Alliance's proffered justification for refusing to consider or promote Keller entitles it to summary judgment. According to Ryan, the position of Chief Operating Officer required line experience and a thorough understanding of the company's business, which he claims Keller lacked. Yet, as discussed above, Ryan's alleged statement that Keller may be too old to do his job, made only weeks before the promotion decision, is evidence from which a jury could infer discrimination. Furthermore, Keller points to evidence from the Chair of Credit Alliance's predecessor company that he did, in fact, have a thorough understanding of the business and was considered a candidate for president of the company at the time Ryan was ultimately selected. In light of this evidence, a factfinder could conclude that Credit Alliance's claim that Keller was not qualified is pretextual. Consequently, there is sufficient direct, as well as indirect, evidence from which a factfinder could also conclude that Keller was not promoted because of his age.

CONCLUSION

To summarize, I believe that there is sufficient direct and indirect evidence of discrimination for Keller's ADEA and

41

NJLAD claims to survive summary judgment. I would, accordingly, reverse the district court's judgment in its entirety and remand for further proceedings.

Joined by Judges Mansmann and McKee.

A True Copy:
Teste:

    Clerk of the United States Court of Appeals
    for the Third Circuit

42