**Wilson E. KEPPLE, Plaintiff,**

v.

**GPU INCORPORATED, a Pennsylvania Corporation, Defendant.**

**No. Civ. A. 96–218J.**

United States District Court,
W.D. Pennsylvania.

April 17, 1998.

---

Joel S. Sansone, Scanlon & Sansone, Pittsburgh, PA, for Plaintiff.

Paul R. Lewis, G. Thompson Bell, III, Stevens & Lee, Wayne, PA, for Defendant.

### MEMORANDUM OPINION AND ORDER

D. BROOKS SMITH, District Judge.

Defendant GPU, Inc. moves for summary judgment on all counts of plaintiff Wilson

Kepple's action for employment discrimination based on his religion, age and gender. *See* dkt. no. 10. For the following reasons, I will grant summary judgment for defendant on plaintiff's federal religion claim, in addition to his state law discrimination claim under the Pennsylvania Human Relations Act ("PHRA"). I will deny summary judgment on plaintiff's federal claims of age and gender discrimination.

## I. FACTS

### A. Introduction

This action arises out of two discrete events in Kepple's employment history with defendant. Prior to its reorganization in 1995, defendant GPU was a non-operating holding company with three wholly-owned subsidiaries: Penelec, Met–Ed Corp. and Jersey Central Power & Light Co. Dkt. no. 12, Exh. 1, at 1. Each of these subsidiaries operated independently, with separate management and areas of operation. *Id.* at 1–2. Plaintiff was employed initially by Penelec in April 1974 as a production performance engineer. Dkt. no 13, Exh. 28. Between 1974 and 1995, he held various engineering and management positions at Penelec's Seward, Homer City and Conemaugh generating stations. *Id.* Plaintiff professes to be a Fundamentalist Christian. Dkt. no. 13, Exh. 15, at 59.

During defendants' reorganization, the energy production function of these companies, including Penelec, was combined into one company, which was named Genco and based in Johnstown, Pennsylvania. Dkt. no. 12, Exh. 3, at 2. Other key functions were likewise consolidated into several different entities.[1] *Id.* Each new entity is individually managed, has a separate labor relations policy and was staffed during reorganization primarily with incumbent employees selected through an elaborate drafting process. GPU, Inc. remains as the holding company. *Id.*

Plaintiff's discrimination claims, although premised on the reorganization which left him without an engineering position at Gen-

co, depend partly on much earlier events at Penelec. He alleges that religious discrimination motivated his demotion in 1987 and subsequently soured his career opportunities at Genco. Dkt. no. 19, at 8–13. He also alleges that gender and age discrimination worked against him in the 1995 Genco staffing drafts. *Id.* at 14–22. The factual record of these events will be set forth *seriatim.*

### B. The 1987 Demotion

After holding various engineering positions with Penelec, plaintiff became Station Engineer at the Seward Generating Station in 1979. Dkt. no. 13, Exh. 14, at 33. He was promoted to Maintenance Superintendent at Seward in February 1981, *id.* at 38, and later, to Manager of Maintenance at Homer City in February 1985. *Id.* at 40. Homer City was a larger, more complex station which was partially owned by New York State Electric and Gas Company; there, plaintiff supervised more employees and assumed greater responsibilities. *Id.* at 40–41; Dkt. no. 13, Exh. 18, at 41.

Ron Lantzy, plaintiff's direct supervisor at Homer City, annually assessed plaintiff's performance. These reviews were also signed by John Herbein, then Penelec's Vice President of Station Operations. Dkt. no. 13, Exh. 24. Cognizant that plaintiff was new to the position and station, Lantzy testified that he gave plaintiff the benefit of the doubt. Dkt. no. 13, Exh. 18, at 22. Accordingly, plaintiff's 1985 review contained average to high ratings (a rounded 4 out of 5) plus specific suggestions for improvement. Lantzy thought Plaintiff a satisfactory performer, *id.* at 19, although, in the "Performance Factors" section of the review form, he noted:

1. *Job Skills*—"additional focus on the 'managing of people' aspect will improve this category."

2. *Decision-Making*—"Makes effective decisions, normally. More exposure and experience will improve decision-making."

3. *Delegation*—"Delegation needs to incorporate a feel for assignments,

**1.** GPU Energy took over the distribution of electric power to customers, GPU Nuclear Corporation was given responsibility for defendant's nuclear energy production, GPU International was entrusted with foreign operations, and GPU Service Corporation was formed to provide administrative services. *Id.*

necessary instruction, authority and the need for follow-up progress reports to assure respected results are achieved. Responsibility does not fully transfer (if at all) when items are delegated."

4. *Communications*—" ... additional first hand communication with employees is needed in future."

5. *Leadership*—"Ted can improve in this area after he gains experience and becomes more confident and assertive."

Dkt. no. 13, Exh. 24, at 00149 (excerpted). In addition, the "Accountabilities/Significant Projects" section encouraged plaintiff to improve maintenance expenditures, supply availability, daily maintenance programs and personnel relations. *Id.* at 00150. Finally, the "Supervisor's Comments" section noted that "Ted has been faced with numerous challenges ... and he has handled them well. [He] needs to focus efforts on his 'people managing' role and to assume greater ownership of maintenance activities and deficiencies ..." *Id.* at 00151. Overall, there was only one unsatisfactory mark, a "2" rating for delegation. Despite these suggestions, the overall tenor of the review was favorable. Dkt. no. 13, Exh. 18, at 22.

In his 1986 Review, Dkt. no. 13, Exh. 25, plaintiff's rounded rating dropped to a 3 as a result of what Lantzy saw as "down sliding." The unrounded decline, however, was only fifteen-hundredths of a point, from 3.45 to 3.30. In the "Performance Factors" section, plaintiff lost one point each in four categories (knowledge of procedures, decisionmaking, teamwork and quality); maintained eight others at average to above-average and gained a point in delegation, a previously flagged problem area. Lantzy specifically commented:

1. *Job Skills*—"Satisfactory. Needs to improve skills of managing people."

2. *Decision-Making*—"Sometimes gets hung up on issues and misses the broader picture of what needs to be accomplished."

3. *Delegation*—"Sometimes delegation is made without sufficient follow-up ..."

4. *Communication*—" Ted communicates well ... needs to practice more 'emotions' at appropriate times to better communicate approval/disapproval."

5. *Quality*—"Quality of work suffers due to the effort to push out the quantity—better balance is needed."

*Id.* at 00145. In the "Accountabilities/Significant Projects" section, Plaintiff lost a point in each of three areas: monitor/control expenditures, improve efficiency of maintenance personnel, provide guidance in improving quality; gained one point in two areas: assure supplies, member of big stack group; and held steady in four others. *Id.* at 00145–46. Lantzy's only true cautionary comment was to "focus efforts on improving relations with supervisors." *Id.* at 00146. The "Supervisor Comments" section of the review recommended that plaintiff improve his "cooperative skills to obtain needed support" in outage planning, stores, and supervisor/bargaining unit attitude and performance. *Id.* In the "Employee Comments" section, Plaintiff listed his achievements and future career goals without either questioning the review or discussing his plans for improvement. *Id.*

In August 1987, a month before his next review, plaintiff attended an outside seminar entitled "Value of the Person" with three other people. Dkt. no. 13, Exh. 14, at 95–96. This program had a religious theme, and was taught by a Christian instructor who made references to God. *Id.* at 113–114. Its message was essentially to treat others with respect, *id.* at 97; Dkt. no. 13, Exh. 18, at 90, or, as plaintiff put it, to "stop doing things mans' way and to start doing things God's way." Dkt. no. 13, Exh. 14, at 114. Plaintiff told his management, specifically Lantzy, about this program. *Id.* at 91.

In November 1987, John Skelly of Penelec's Human Resources Department assessed the seminar for possible inclusion in Penelec's training programs. Dkt. no. 13, Exh. 22, at 26–27. Skelly ultimately rejected it, however, as incompatible with Penelec's goals because it portrayed "top management as inherently dangerous and unappreciative of their people[,]" and organized labor as "anarchists who pushed against the wall."

*Id.* at 19–20. Although the speaker mentioned the Bible, Skelly could not recall any explicit religious focus. *Id.* at 25, 29. Lantzy, for his part, recalled mention of Christian-based principles but did not think they were a significant component. Penelec never adopted the program.

On September 4, 1987, one month after the seminar and two months prior to Skelly's rejection of it, Lantzy reviewed plaintiff's job performance a few weeks earlier than normal. *Compare* dkt. no. 13, Exh's 24, 25 (reviews held in October 1986, 1986) *with id.,* Exh. 26 (documenting September 4, 1997 meeting regarding plaintiff's performance). Lantzy later documented the meeting in a September 11 letter which he sent, with a copy of the review, to plaintiff. *Id.,* Exh. 26. On September 18, Lantzy prepared a second review containing more detailed criticism. Dkt. no. 13, Exh. 27. Plaintiff, at that point, understood that his job was in danger. Dkt. no 13, Exh.14, at 89.

Lantzy's letter requested "significant positive improvement" to maintain his position and flagged several key deficiencies, including "Decision-making, Communications, Leadership, Teamwork, and Quality" plus "five of [Plaintiff's] principal Accountabilities." Dkt. no. 13, Exh. 26. The letter also stated:

> "Perhaps your overall lack of experience and managerial effectiveness have been responsible for the sub-standard level of your performance over the past two and one-half years in the position. Regardless, the managerial needs of Homer City Station have not been met to the extent that management changes will have to be made within the next six months if the situation warrants such change ... The seriousness of this situation cannot be stressed enough."

*Id.*

The accompanying review contained an average rating of 2.7. *Id.* In the Performance Factors section, plaintiff lost a point each in five categories (Planning, Leadership, Teamwork, Employee Development and Timeliness) and two in Communication. Specific comments included:

1. *Decision-making*—"Needs improvement in making appropriate decisions."

2. *Communications*—"Ted needs improvement in how he transmits his ideas, concerns, etc. to others to maintain support to achieve goals. Needs to be firm in communication."

3. *Leadership*—"Needs to demonstrate leadership, firmly lead subordinates."

4. *Teamwork*—"Ted must improve his and his department's interaction with others to build the necessary teamwork."

5. *Quality*—"Quality of work is short of expectation and must improve."

*Id.* In the Accountabilities/Significant Projects section, plaintiff lost points in six categories. Specific criticism included: "[b]udget understanding and control not taken seriously;" "[s]hortcomings in Station Maintenance ... and teamwork has been a problem;" "[c]ommunication and teamwork falls short of target" and "assertiveness and determination to enforce Accountabilities falls short of needs." *Id.* Plaintiff's efforts to assure that adequate tools and supplies were kept in inventory, however, were specifically praised. *Id.*

The September 18th review contained identical ratings and comments but also included an extended Supervisor and Employee Comments section. Lantzy wrote:

> "Ted must assess his approach to managing ... and establish himself as a capable leader. He must also establish support of other departments as needed ... Performance deficiencies in Decision–Making, Communication, Leadership, Teamwork, Quality and five other principal Accountabilities must be corrected if Ted is to remain in his present position ... I have stressed the seriousness of the situation over and over again."

*Id.* Although plaintiffs final average rating was 2.7, down from 3.30 the previous year, his rounded rating remained at 3.

In the section of the review form designated for the employee to relate his comments, goals and aspirations, plaintiff responded

that he had already begun to rectify the problems noted by Lantzy and noted specific "measurable and noticeable improvements." He also stated that he wanted a higher level management position and listed his accomplishments.

Other members of Penelec management, some of whom would later be involved in the reorganization, knew about plaintiff's performance difficulties. Lantzy had asked Larry Gebhardt, a Penelec personnel representative, for advice on how to handle this type of problem. Dkt. no. 13, Exh. 18, at 35–36. Herbein, although unfamiliar with Plaintiff's actual performance, signed his reviews and understood that Lantzy had specific criticisms of plaintiff's work. Dkt. no. 12, Exh. 12, at 50–51.

Lantzy ultimately recommended transferring plaintiff to the position of Station Engineer at the Conemaugh generating station. Plaintiff was summoned to meet with Lantzy and Herbein in Herbein's office and was told that he was being transferred because of a budget overrun in his department. Dkt. no. 13, Exh. 14, at 110. Fearful for his career, Plaintiff did not question these decisions. *Id.* Effective January 25, 1988, he was transferred with no salary or benefits change despite a drop in grade level from 22 to 17. Dkt. no. 13, Exh. 29. Plaintiff's new direct supervisor was John Barron.

Citing the proximity of his demotion to the "Value of the Person" seminar, plaintiff now asserts that Lantzy was motivated by disapproval of the seminar's religious content and, by implication, by disapproval of plaintiff's own beliefs. Dkt. no. 13, Exh. 14, at 92. He states that other seminar attendees told him of Lantzy's disapproval, *id.* at 112, although the record does not contain their testimony. From the other attendees, plaintiff understood the seminar to be a "hot issue" with someone, most likely Lantzy. *Id.* Moreover, although he expressed no such sentiment at the time it was given, plaintiff now disagrees with the unfavorable 1987 review and, noting previous favorable assessments, alleges that Lantzy fabricated most of it. Dkt. no. 13, Exh. 14, at 100–06.

## C. The 1994–95 Reorganization

### 1. *The Drafting Process*

In 1994, the GPU companies underwent reorganization, the purpose of which was to streamline operations through functional regrouping, and a process which typically involved downsizing. Dkt. no. 13, Exh. 20, at 21–22; Dkt. no. 12, Exh. 8, at 21. A team first identified the companies' six core processes: 1) Produce Energy; 2) Modify Plant; 3) Growth; 4) Provide Fuels and Materials; 5) Collect and Disburse Money; and 6) Recruit and Develop People. Dkt. no. 13, Exh. 20, at 23–24. The "Produce Energy" process became the responsibility of Genco. Each process had an "owner." Herbein became the Produce Energy Process Owner, in other words, the person responsible for all of Genco's power generation functions. Dkt. no.12, Exh. 13, at 4–5, 13.

Each individual generating station had six Local Process Owners ("LPOs"). At each station, the LPO of Produce Energy ("PELPO") became the equivalent of the former Station Director. Dkt. no. 11, at 13. John Gritzer held that position at Conemaugh, where plaintiff was employed in 1995. *Id.* at 15. Together, these six local process owners formed the "Station Leadership Team." At Conemaugh, this team included Barron (plaintiff's direct supervisor), Gritzer (Conemaugh's PELPO), John Humphrey, Carl Dodson and Debbie Kuhne. *Id.*

An elaborate drafting system was put in place to staff Genco. *See* Dkt. no. 13, Exh. 1 to Exh. 20 (outlining the structure and goals of the drafting process). First, an evaluation team identified twenty areas of competency by which each employee would be assessed for his or her future capability to adapt to Genco's new policy of employee self-direction. *Id.* at 12. These twenty competencies were developed "in lieu of using the [then-]current performance evaluation process." *Id.* Thus, rather than simply referring to past reviews, each supervisor or group of supervisors was required to rate the employee "on the skill areas which are believed to be important to Genco." *Id.* at 7. Employees were to submit personal data sheets and preferred duty stations. Supervisors then used the competency evaluations to

assess and rank their direct reports within four separate, equally-sized quartiles. Dkt. no. 12, Exh. 8, at 22. This evaluation was based solely on the raw score from the competency assessment. Station leadership teams then worked with the Modify Plant Leadership Team to further reassess the rankings. *Id.* at 24. This was required in order to eliminate rater bias and promote fair comparison of employees reporting to different supervisors. Dkt. no. 13, Exh. 1 to Exh. 20, at 13–14. Quartile rankings from each of the three companies were then combined.

After quartiling, two separate personnel drafts were held, one for technical positions and a second for production and administrative positions. In these drafts, the PELPOs and the Modify Plant Leadership Team selected employees in four rounds. Dkt. no. 13, Exh. 20, at 75–76. In each round, these eighteen selectors filled one-fourth of the total positions per station. Selectors could pick regardless of quartile, but challenges to their selections were permitted. In the third or fourth rounds, any selection from other than the highest available quartile resulted in a mandatory challenge. *Id.* at 76, Exh.1 to Exh. 20, at 15–16. Gary Moyer and Ron Smith from the Recruit and Develop People Process analyzed each round for disparate impact on race or gender. *See* Dkt. no. 13, Exh. 1 to Exh. 20, at 16.

### 2. The Technical Draft

Engineers were selected in the technical draft held on September 4, 1995. Prior to that date, Conemaugh's leadership team had determined that it could eliminate one mechanical and one electrical engineer. Dkt. no. 12, Exh. 8, at 21–22. The Conemaugh selectors were accordingly aware that they had only fourteen positions for sixteen incumbents. Barron assessed and ranked his sixteen direct reports. *See* Dkt. no. 13, Exh. 31. Plaintiff placed sixth out of fifteen,[2] falling into the second quartile with a score of 107.

The station leadership team reviewed and debated these ratings. *See* Dkt. no. 13, Exh. 32. Each team member was familiar with

each engineer, having relied on them in their own work. This reassessment changed the rankings, especially for eight engineers, five of whom increased and three of whom decreased. In particular, Brandick, a twenty-four year old female, jumped up by three positions, from eighth to fifth. Of the three engineers who moved down, all were males over age forty. Jacoby lost three places, Lewis lost four and plaintiff was downgraded five places, from sixth to eleventh. Klavuhn, a female aged thirty-four, was ranked thirteenth in both assessments with a score of 82. *Id.*

Barron and Gritzer both testified about the changes. Although Barron had more personal knowledge of the engineers, he agreed that the re-rankings represented a considered consensus. Dkt. no 12, Exh. 8, at 26. The team members discussed each engineer on all twenty competencies, the goal being to "assess[ ] how these people will function and fit into the new Genco we're creating" without actually comparing them. Dkt. no. 12, Exh. 11, at 58. Conemaugh's rankings were then combined with rankings from the rest of Penelec and the other two companies. Plaintiff was ultimately ranked in the third quartile and Ms. Klavuhn was ranked in the fourth.

Two Conemaugh engineers, Plaintiff and Johnson, were unselected. Both were male and over forty years old. Gritzer, on behalf of Conemaugh, chose Ms. Klavuhn, a lower quartiled employee, over plaintiff.

Gritzer defended this choice with specific reasons. He felt Klavuhn offered leadership, self-motivation, self-direction, communication, common sense and diversity more consistently than plaintiff did. Dkt. no. 12, Exh.11, at 62. Overall, the team saw her "as a person who was the future of Genco" and Gritzer "didn't see [plaintiff] to be that same future." *Id.* at 63. In contrast, Gritzer interpreted Plaintiff's known interest in labor relations positions as evidence that he was unsatisfied being a station engineer. *Id.* at 63–64. In that context, Gritzer testified that plaintiff had repeatedly removed the "Station Engineer" sign from his door because it was

---

2. Barron initially ranked 16 employees, one of whom, a Mr. Bartek, was subsequently re-ranked

separately by the leadership team as an engineering associate.

"a constant reminder of [his] demotion." Dkt. no. 13, Exh. 15, at 127–129. When confronted, plaintiff said he did not consider himself to be a station engineer. Dkt. no. 12, Exh.11, at 64. Plaintiff also frequently bid on non-engineering jobs for which both Gritzer and Barron made reference calls on his behalf. *Id.* at 64–65. To Gritzer, these actions reflected poorly on plaintiff's motivation, leadership, and his commitment to his position. *Id.* at 63–64.

Barron also testified that, although he had rated plaintiff higher than Klavuhn, he nevertheless agreed with Klavuhn's selection. Dkt. no. 12, Exh. 8, at 40–41. He, too, thought that she was constantly improving whereas plaintiff had "leveled-off." *Id.* at 42. Barron specifically admitted that gender was a factor "that swayed the decision" in Klavuhn's favor, *id.* at 46, but declared later in the deposition that gender played only a small role. *Id.* at 47. Barron's expectation that plaintiff would be chosen by another station in the non-technical draft also weighed in Klavuhn's favor. *Id.* at 49.

Following the technical draft, plaintiff and Barron talked about plaintiff's nonselection. Plaintiff recalls one discussion in which Barron told him that he was deliberately ranked lower to "protect" Klavuhn. Dkt. no. 13, Exh. 15, at 49.

### 3. The Production and Administrative Draft

Unselected in the Technical Draft, plaintiff was then added to the production and administrative draft. Al Slowick, the Produce Energy LPO at Homer City, apparently wanted him for a specific program, although Herbein had not yet approved it as an open position. Dkt. no. 13, Exh. 23, at 19–20. Slowick's plan to select plaintiff was common knowledge; Barron discussed it with Slowick and Slowick told plaintiff he wanted to draft him. *Id.* at 23.

Slowick, however, said he later learned things about plaintiff at a meeting of his immediate subordinates that changed his mind. In particular, Slowick learned from employees Tremel, Sharbaugh and Dore about plaintiff's unsuccessful attempts to "develop certain management programs" at Homer City in the 1980s. *Id.* at 23–24. Slowick's subordinates suggested that plaintiff would not "fit in" because he had a different style and was not a team player. *Id.* at 25. Because these men would have to work directly with plaintiff and were evidently not interested in doing so, Slowick believed that it would not "make sense to draft [plaintiff] into that situation." *Id.* at 38. In addition, Slowick was aware of the station engineer sign incident, which he had heard from Gritzer, and that plaintiff reputedly had "a strange way of doing certain things." *Id.* at 30. Ultimately, Herbein did not approve the assignment as a separate position; it became an additional duty of another male employee over forty years of age, a Mr. Green. *Id.* at 21–22. Thus, plaintiff remained unselected after the second draft.

### 4. The Aftermath

Generally, unselected employees who, like plaintiff, were not old enough to retire were offered enhanced severance in return for a release of all employment-related claims. Dkt. no 13, Exh. 20, at 86–88. That was deferred in plaintiff's case, however, because Genco still had some temporary work assignments to fill. Accordingly, plaintiff was placed on a project known as the Plant Decommissioning Study, on which he still received his former salary and benefits. *Id.* at 108–09; Exh. 15, at 142. In April 1996, he took a bargaining unit position as coal handler at Homer City. Exh. 15, at 141–45; Dkt. no. 12, Exh. 1, at 2. In late 1996, he became Production Supervisor at Seward. *Id.*, Exh. A. to Exh. 3.

Plaintiff filed a discrimination charge with the EEOC on January 23, 1996, received a right to sue notice dated May 17 and filed this action on August 12 of that year. Following the close of discovery in August 1997, defendant filed the instant motion for summary judgment, which is now ripe for disposition.

## II. PRELIMINARY LEGAL ISSUES

### A. The Proper Defendant

Defendant argues that GPU, Inc. is not the proper defendant in this case because that entity never employed plaintiff. Dkt. no. 11, at 31–34. Instead, the employment and reor-

ganization decisions concerning plaintiff were made or controlled by management and executives of Penelec and Genco, for which plaintiff actually worked. Defendant urges that Genco or Penelec be named instead, and Plaintiff offers to stipulate that either is a proper defendant and liable for any judgment, dkt. no. 19, at 1. Defendant does not oppose plaintiff's offer, believes that the proper defendant "should be Genco and will prepare the necessary stipulation." Dkt. no. 22, at 1 n. 1. I will allow that stipulation and proceed, for present purposes, as though Genco had been the named defendant *ab initio.*

### B. Claims under the Pennsylvania Human Relations Act

■ In addition to his federal causes of action, plaintiff has asserted state law claims under the Pennsylvania Human Relations Act, 43 P.S. §§ 959, 962. Before a federal court can exercise jurisdiction over such a claim, the complainant must have exhausted his administrative remedies through the Pennsylvania Human Relations Commission ("PHRC"). This requirement is not met by filing with the federal EEOC. *Woodson v. Scott Paper Co.,* 109 F.3d 913, 925–27 (3d Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 299, 139 L.Ed.2d 230 (1997).

■ Here, although he filed with and received a right to sue letter from the EEOC, plaintiff has not alleged that he filed a claim with the PHRC and makes no argument in his brief that he has effectively exhausted his state remedies. *See* Dkt. no, 12, Exh.1, at 10; Dkt. no. 19. Thus, defendant is entitled to summary judgment on the state law claims. *Woodson,* 109 F.3d at 927.

### C. Summary Judgment Standard

Summary judgment is appropriate where admissible evidence fails to demonstrate a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). If the nonmoving party bears the burden of persuasion at trial, the moving party must show that the nonmoving party's evidence is insufficient to carry that burden. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party can create a genuine issue of material fact by pointing to evidence in the record sufficient to support a jury verdict in its favor at trial. *Brewer v. Quaker State Oil Refining Corp.,* 72 F.3d 326, 330 (3d Cir.1995). Such evidence must be significantly probative and more than "merely colorable." *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994). The nonmoving party is afforded the benefit of all reasonable inferences drawn from the record. *Id.*

### D. Legal Framework for Evaluating Employment Discrimination Claims

Title VII of the Civil Rights Act of 1964 prohibits discrimination based on gender and religion in employment. 42 U.S.C. §§ 2000e *et seq.* Likewise, the Age Discrimination in Employment Act ("ADEA") prohibits age-based employment discrimination against any individual over forty years old. 29 U.S.C. § 623(a)(1). The burden-shifting framework used under Title VII is also applicable to ADEA claims. *Brewer,* 72 F.3d at 330.

■ Both Title VII and the ADEA require a plaintiff to establish a prima facie case of unlawful discrimination. That burden is not onerous. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Here, because defendant's reorganization reduced the number of positions available to incumbent employees, it is appropriate to use the prima facie showing specifically developed for "reduction of force" cases. Thus, for each claim, plaintiff must show that: (i) he belonged to a protected class; (ii) he applied and was qualified for the available position; (iii) he was laid off or passed over; and (iv) other workers not belonging to the protected class were retained. *See Armbruster,* 32 F.3d at 777.

■ Once this prima facie showing is made, the nature of plaintiff's admissible evidence dictates the governing framework. *Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 513 (3d Cir.1997). Where direct, "smoking gun" evidence exists showing that an illegitimate criterion played a substantial role in the employment decision, the burden of both production and persuasion shifts to the defendant, *id.* at 512 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct.

1775, 104 L.Ed.2d 268 (1989)), which must then show that the same decision would have been made, even absent discriminatory animus. *Id.* at 512 (citing *Armbruster*, 32 F.3d at 778).

■ On the other hand, if plaintiff offers only circumstantial evidence from which to infer discrimination, the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies. Accordingly, once plaintiff establishes his prima facie case, the burden of production (but not the burden of persuasion) shifts to defendant to articulate a legitimate nondiscriminatory reason. *Brewer*, 72 F.3d at 330 (citing *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). If defendant adduces such evidence, the plaintiff can survive summary judgment only by pointing to pretextual evidence in the record "from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating and determinative cause of the employer's action." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (in banc) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994)).

To survive summary judgment under the first prong of the pretext test, the plaintiff must discredit the defendant's reasons, not by "simply show[ing] that the employer's decision was wrong or mistaken . . . [but r]ather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence." *Keller*, 130 F.3d at 1108–09 (quoting *Fuentes*, 32 F.3d at 765). If plaintiff uses prong two, he must identify evidence "allow[ing] the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 1111 (quoting *Fuentes*, 32 F.3d at 762). Such evidence must prove discrimination "based solely on [its] natural probative force[.]" *Id.*

### E. *Plaintiff's Qualifications*

The second prima facie element of a discrimination case requires plaintiff to show that he applied for and was qualified for the position he unsuccessfully sought. In addition, he must identify for comparison the non-protected employees who were treated more favorably. Citing plaintiff's answers to interrogatories, dkt. no. 12, Exh. 4, at 10, defendant has identified eighteen employees whom it understands plaintiff to argue were treated more favorably than he was. Defendant disputes plaintiff's qualifications to compete for any of their positions. Dkt. no. 11, at 47–64. In response, plaintiff asks that a jury be permitted to determine the qualification issue but specifies only Ms. Brandick and Ms. Klavuhn, both mechanical engineers, as favored employees for whose positions he was qualified. Dkt. no. 19, at 18–20. Thus, it could well be argued that plaintiff has waived the qualification issue as to all of the others. Nevertheless, I will consider whether plaintiff could be considered qualified to perform outside the mechanical engineering discipline.

Plaintiff holds a variety of degrees, and by 1995 had amassed over twenty-two years of experience with Penelec. He earned a Bachelor of Science in Mechanical Engineering in 1973, for which he also took elective courses in electrical engineering and basic chemistry. Dkt. no. 13, Exh. 14, at 7–8. After joining Penelec, plaintiff received further university training in electrical engineering but not in chemical engineering. *Id.* at 17–19. In 1984, he received a Masters of Business Administration, for which he took courses in accounting, statistics, labor relations, budgeting, finance, business and business theory. *Id.* at 9–13. In 1986, while Maintenance Manager at the Homer City generating station, plaintiff studied labor law, grievance resolution and took a variety of personnel management courses, earning a master's degree in Industrial and Labor Relations. *Id.* at 14–16.

Advancing through Penelec, Plaintiff was widely exposed to different jobs and frequently managed employees working in other disciplines. For his first four years, he was a production engineer at Seward, dispatched from headquarters to troubleshoot and solve

equipment problems. *Id.* at 21–25. Later, as a boiler engineer, he inspected, modified and repaired coal-fired boilers. Dkt. no. 13, Exh. 28. As a quality control engineer, plaintiff supervised quality control and contracted for repairs on boilers and equipment generally. *Id.* In 1979, he became Station Engineer at Seward, where he ensured regulatory compliance, maintained supplies and coordinated personnel training. He also participated in the start-up of a waste treatment facility. *Id.* In all of these positions, plaintiff functioned as a mechanical engineer. Dkt. no. 13, Exh. 14 at 34–35. In 1981, plaintiff became Maintenance Superintendent at Homer City, focusing more on management skills and less on engineering duties. *Id.* at 39. He "[s]upervised 50 union craftsmen through 7 supervisors[,]" prepared station budgets and oversaw maintenance activities. Dkt. no. 13, at 28.

After plaintiff's 1987 demotion, he was again a station engineer, this time at Conemaugh, where he monitored and improved operations of pulvurizers and turbine deck equipment. Dkt. no. 13, Exh. 14, at 44–45. Plaintiff characterized his work at Conemaugh as "electromechanical" since turbines have both mechanical and electrical components. *Id.* at 52. He worked alongside electrical and chemical engineers, although he acknowledged his dependence on chemical engineers for certain activities. *Id.* at 59–60. In the early 1990's, Plaintiff participated in the start-up of a new scrubber plant. He also got increasingly more involved with personnel issues, becoming a trained "Team Facilitator" who organized meetings. *Id.* at 54–55.

Mechanical, electrical and chemical engineering are three separate disciplines. *Id.* at 9. Plaintiff identified a progressive effort to integrate work within these disciplines at Conemaugh in the 1990s, primarily because generating operations are interdependent. *Id.* at 65, 69. Although each mechanical engineer had a specialty, they worked together to optimize equipment performance. *Id.* at 66–71. Moreover, engineers from different disciplines would often work alongside one another.

Plaintiff claims that these work experiences, along with his diverse educational background, qualified him for a position as either a mechanical, electrical or chemical engineer. *Id.* at 167, 169, 175. At the prima facie stage, the court views plaintiff's qualifications objectively, requiring, at a minimum, the experience and education necessary to be a viable candidate for the position. *Sempier v. Johnson & Higgins,* 45 F.3d 724, 729 (3d Cir.1995). The employer is entitled to establish the job requirements and the plaintiff must offer more than his own opinion that he is qualified. *In re Carnegie Center Associates,* 129 F.3d 290, 298 (3d Cir.1997).

Plaintiff had been classified as an "Engineer Senior I" since his 1987 demotion. The 1993 job description for this position provided by defendant states that "[t]his position provides engineering services and support *in one of these disciplines:* Chemical, Civil, Electrical, Instrumentation and Controls, or Mechanical Engineering." Dkt. no. 12, Exh. A to Exh. 5, at 1 (emphasis added). Although the position requires knowledge of station operations and engineering principles, the description emphasizes that these requirements pertain to "[the employee's] area of engineering expertise." *Id.* at 1,2, 3.

Defendant's witnesses do not offer as expansive a view of plaintiff's qualifications as he does. Gritzer stated that engineers were typically compartmentalized in their specific disciplines and that plaintiff was not overly involved in other areas. Dkt. no. 12, Exh. 11, at 20, 22. Gritzer doubted whether plaintiff could perform as an electrical or chemical engineer. *Id.* at 69–70. In addition, Gritzer characterized Ms. Klavuhn, a mechanical engineer by education, as a "thermal performance engineer" and did not think plaintiff could perform her job. *Id.*

Plaintiff has offered no evidence, other than his own assertion, that he was capable of performing in any other discipline than mechanical engineering. This is insufficient. Absent some showing, for example, that persons with his background are commonly employed in such an interdisciplinary fashion in either the industry in general, or the company in particular, he cannot meet his prima facie burden of proving his qualifications. To put it in another context, an orthopedic surgeon is not qualified for employment as a neurologist, even if he or she has taken medi-

cal courses in that discipline and worked extensively in hospitals alongside neurologists.[3] Hence, plaintiffs qualifications will be compared only to those of Klavuhn and Brandick, who, like plaintiff, were mechanical engineers at Conemaugh.

Plaintiff was objectively qualified for a position as a mechanical engineer. At the beginning of the technical draft, there were six mechanical engineers at Conemaugh, including plaintiff. Of the five remaining, two were younger than plaintiff and one was female. Ms. Klavuhn was both. At this point, then, plaintiff has established a prima facie case of sex and age discrimination because Ms. Klavuhn was selected for a position for which he was also qualified.

The record contains a discrepancy regarding Ms. Brandick. The draft records indicate that she was a chemical engineer in 1995, dkt. no. 13, Exh. 33, at 2, but the master list of mechanical engineers contains her name, Dkt. no. 12, Exh. B. to Exh. 5, at 2. Brandick, who was twenty-four during the draft, stated that she was trained as a chemical engineer and currently holds the Station Engineer position at Conemaugh, where her duties involve 40% management work and 60% Chemical Engineering. Dkt. no. 12, Exh. 9, at 5, 13. Of her engineering duties, she estimated that 20% could be performed by a non-engineer. *Id.* at 24. At the prima facie stage, given the discrepancy in the record, I will conclude, for summary judgment purposes only, that plaintiff is qualified to hold Brandick's station engineer position. Thus, plaintiff has made his prima facie showing of qualification regarding both Klavuhn and Brandick.

## III. PLAINTIFF'S SUBSTANTIVE CLAIMS

### A. *Religious Discrimination*

Plaintiff alleges that his 1987 demotion and his failure to be selected in the 1995 drafts, as well as various intervening adverse employment events, were the result of, *inter alia,* religious discrimination. Defendant responds by arguing, first, that the 1987–95 pre-draft claim is time-barred and, second, that the 1995 draft claim fails on its merits. I will address these contentions *seriatim.*

#### 1. *Pre-Draft Claims and the Continuing Violation Theory*

Plaintiff admits, as he must, that his claim of religious discrimination predicated on conduct beginning in 1987 significantly predates the statute of limitations. He asserts, however, that he is nevertheless entitled to recover based on the "continuing violation" theory, to which I first turn.

Title VII requires that plaintiff file his charge of discrimination within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e–5. The continuing violation theory, however, can extend this limitations period in certain limited circumstances. If the plaintiff alleges that at least one violation occurred within the 300–day period and the other requirements of a continuing violation are met, he can then offer evidence and recover for earlier, related discriminatory conduct that would otherwise be time-barred. *See, e.g., West v. Philadelphia Electric Co.,* 45 F.3d 744, 754–755 (3d Cir.1995).

To successfully assert a continuing violation, a plaintiff must establish, first, at least one discriminatory act occurring within the 300 day period, and second, that the discrimination is "more than the occur-

---

**3.** For this reason, plaintiff is also unqualified for the position awarded to Debra Kuhne, who was the Local Process Owner of Collect and Disburse Money. While plaintiff did have significant business and accounting coursework, he did not meet the requirements for the position, which included ten or more years "experience in the accounting departments of the company[.]" Dkt. no. 13, Exh. 17, at 26. In addition, plaintiff is not a CPA, a credential which the company highly prefers in candidates for that position. *Id.* In his deposition, plaintiff admitted that Ms. Kuhne was the better qualified candidate from the stand-

point of financial background, and asserted only his greater knowledge of the plant itself as better qualifying him for the job. Dkt. no. 13, Exh. 14, at 172–73. By that reasoning, any person with a long tenure at the plant and some academic background in accounting and finance would have to be considered qualified for Kuhne's position, which entailed primary responsibility for managing a $62 million annual budget. Accordingly, I conclude that plaintiff has not raised a genuine issue of material fact, other than his own subjective view of his abilities, regarding Ms. Kuhne's position.

rence of isolated or sporadic acts of intentional discrimination." *Id.* at 754–755. Thus, a plaintiff must show an on-going pattern or practice of discrimination by the defendant. *Id.* The Third Circuit, in distinguishing between an on-going pattern of discrimination and unrelated, isolated events, examines the following factors:

(a) *subject matter*—do the violations constitute the same type of discrimination?

(b) *frequency*—did the alleged acts recur throughout the relevant time period?

(c) *permanence*—should the nature of the violation trigger the employee's awareness of the need to assert his rights and do its consequences continue even in the absence of a continuing intent to discriminate?

*Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481–82 (3d Cir.1997) (citing *Berry v. Board of Supervisors of Louisiana State Univ.,* 715 F.2d 971, 981 (5th Cir.1983)). The permanence factor is considered the most important of the three. *Rush,* 113 F.3d at 482.

The continuing violation theory has been successfully invoked in sexual harassment claims, *West,* 45 F.3d at 755, and in cases involving the repeated application of discriminatory written policies. *Courtney v. LaSalle Univ.,* 124 F.3d 499, 506 (3d Cir.1997). In contrast, it cannot be used to challenge discrete employment decisions, such as the failure to promote, if a plaintiff should have known that his rights were violated at the time of decision. *See Rush,* 113 F.3d at 483–84 (rejecting the continuing violation theory because failure to promote is a discrete incident).

██ Plaintiff argues that since the 1987 seminar and subsequent demotion, there has been "an ongoing conspiracy by certain management personnel of the Defendant, the object of which was to adversely affect Plaintiff's employment with the Defendant." Dkt.

no. 19, at 2. He claims that religious discrimination motivated the demotion and was later used to deny him promotions and assignments. That religious animus was rekindled, he asserts, when decisionmakers familiar with his work history did not select him during the 1995 reorganization. In sum, plaintiff claims that a pattern of religious discrimination existed and ultimately cost him a position at Genco. If this assertion is correct, plaintiff may introduce evidence dating from the 1987 demotion and recover for all religious discrimination that occurred subsequent to it. If the continuing violation theory is not applicable, he may challenge only decisions made during and after the 1995 reorganization.

Plaintiff filed no charges with the EEOC over the 1987 demotion or any other employment decision before the reorganization, despite his professed belief that they were motivated by discriminatory animus. Based on *Rush,* I am constrained to reject the continuing violation theory. When plaintiff was demoted, "the continued existence of the adverse consequences of the act [were not] dependent on a continuing intent to discriminate." *Rush,* 113 F.3d at 482. Thus, plaintiff knew or should have known of the permanency of the act, and the concomitant need to assert his legal rights, when the demotion occurred. *Id.* at 480–481.

Nevertheless, I recognize that plaintiff's claims are intertwined and depend partially on events predating the 1995 reorganization. Accordingly, I will evaluate, for purposes of deciding this motion, plaintiff's evidence of religious discrimination dating from the 1987 demotion, but only insofar as it is relevant to show that discriminatory animus based upon religion motivated his non-selection in the 1995 drafts. Recovery for that prior conduct, however, is barred by the statute of limitations. *See Stoller v. Marsh,* 682 F.2d 971, 978–79 (D.C.Cir.1982).[4]

---

4. In *Stoller,* plaintiff alleged that he had been recently denied promotion based on otherwise time-barred performance evaluations of a discriminatory nature. The district court, characterizing his present claim as a challenge to "the present effects of past discrimination," refused to apply the continuing violation theory. *Id.* 682 F.2d at 976. Reasoning that present reliance on past discriminatory evaluations could itself violate Title VII, the court of appeals reversed. *Id.* Although the limitations period prevented plain-

tiff from challenging the earlier employment decisions taken in connection with the evaluations, the evaluations were relevant, probative evidence on his current claim of religious discrimination. *Id.* 682 F.2d at 978–979. *Stoller* is distinguishable from the facts of the case *sub judice* in that plaintiff's past evaluations were not formally considered during the 1995 drafts. Nevertheless, because the selectors were familiar with plaintiff's employment history, including the 1987

## 2. Analysis of Plaintiff's Religious Discrimination Claim

Allegations of disparate treatment on account of religion follow traditional Title VII analysis, although courts have altered slightly the prima facie case to require plaintiff to show that he informed his employer of his religious beliefs. *See, e.g., Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir.1996) (citing *Protos v. Volkswagen, Inc.,* 797 F.2d 129, 133 (3d Cir.1986)); *Vetter v. Farmland Indus., Inc.,* 884 F.Supp. 1287, 1302 (N.D.Iowa 1995).

Plaintiff has adduced evidence to establish that, as a Fundamentalist Christian, he belongs to a protected class and that, despite being qualified, he was denied a position at Genco. At best, however, plaintiff has made a weak showing that Barron, Gritzer and Slowick knew his religious beliefs when they awarded positions in the 1995 drafts. Plaintiff admits he did not actively publicize those beliefs, but implicitly argues instead that his actions, most notably attending and advocating the 1987 "Value of the Person" seminar and authoring a book about Christian management techniques, made them known. Dkt. no. 19, at 8.

Regarding the events surrounding the 1987 seminar and demotion, the record suggests that Lantzy, plaintiff's then-supervisor, may have been cognizant of plaintiff's religion at that time, although the record is far from conclusive on that point. Plaintiff asserted the following as evidence of Lantzy's knowledge:

Q: How did Mr. Lantzy know that you were a Fundamentalist Christian?

A: I discussed the Value of the Person program several times with him.

Q: And what occurred during the course of that conversation that would tell Mr. Lantzy that you're a Fundamentalist Christian?

. . . . .

A: Specifically, he would have had to approve the program. And the information on the program, the fliers clearly show that it is based on Christian principles.

. . . . .

Q: Was there anything that identified the program as Fundamentalist Christian as opposed to some other kind of Christian?

A. I don't think the word Fundamentalist is used in the literature.

. . . . .

Q: Anything else in the course of your conversations with Mr. Lantzy that would tell him that you were a Fundamentalist Christian?

A. Yeah. Various conversations we had about treatment of individuals.

Q. And how would he know that that was Fundamentalist Christian as opposed to some other kind of Christian, as opposed to Jewish, as opposed to Muslim?

A. You know, again, just based on the conversation. The word Fundamentalist that you keep referring to was probably not on the literature or probably didn't come out in the conversation.

Dkt. no. 13, Exh. 15, at 88–89. Lantzy testified that he "recall[ed] some comments about" "the Christian-based principles that were associated with that program[,]" but "didn't see [them] as being a significant . . . issue" or focus of the seminar. To Lantzy, the "principles" were "really common sense[ ]" rather than religious. Dkt. no. 13, Exh. 18, at 90. Lantzy was not asked whether he knew of plaintiff's religious beliefs specifically and did not testify on that point. Although weak, this record could support an inference of Lantzy's knowledge.

Plaintiff suspects that Lantzy fabricated a poor review and ultimately demoted him because Lantzy disapproved of the seminar, Dkt. no. 13, Exh. 15, at 91, 98, 100–106. That claim, regardless of its merit, is time-barred for the reasons discussed *supra.* Thus, in the absence of evidence that this incident influenced later decisionmakers, it is immaterial to plaintiff's prima facie showing.

Plaintiff published *Theory C,* a book about Christian-based management principles, in 1990 while at Conemaugh. He gave copies of this work to, among others, Barron and McKenzie, who passed it to Slowick. Dkt. no. 12, Exh. 4, at 12. The book received

seminar and demotion, I will consider plaintiff's evidence that a continuing atmosphere of religious discrimination affected their decisions in 1995.

newspaper publicity and plaintiff appeared on a local Christian television station. *Id.* at 11. Thus, there is evidence to support a prima facie showing that Barron and Slowick were aware of plaintiff's religious beliefs, although plaintiff admitted in his deposition that Barron did not discriminate against him. *See* Dkt. no. 13, Exh. 15, at 85.

Plaintiff never told Gritzer of his beliefs. Dkt. no. 13, Exh. 15, at 86, 98. He suspects, however, that others did and also assumes that Gritzer saw the *Theory C* book that Plaintiff kept on his desk. *Id.* at 86. Gritzer denied knowing about the book and said he knew little about plaintiff before he came to Conemaugh, aside from plaintiff's previous position within the company. Dkt. no. 12, Exh. 11, at 85, 19. Thus, plaintiff has failed to make the prima facie showing of knowledge as to Gritzer, although he has done so regarding Slowick.

Turning then to the remainder of the burden-shifting analysis, defendant has put forth a legitimate, non-discriminatory reason for not selecting plaintiff, specifically that he was not as motivated and qualified as the other candidates. Plaintiff is accordingly required to come forward with evidence that this reason was a pretext for religious discrimination. I conclude that he has failed to do so.

The record contains nothing other than speculation by plaintiff that religious discrimination played a role in his nonselection. The only possible link between plaintiff's religious beliefs and any adverse employment action is the proximity between the 1987 seminar and his subsequent poor review and demotion. That claim, as already discussed, is time-barred, but even assuming that Lantzy's 1987 review did reflect a discriminatory animus, plaintiff has not shown that Barron and Gritzer, who were specifically required to rank their employees solely on the results of the 1995 core competency evaluation, dkt. no. 13, Exh. 1 to Exh. 20, at 7, were influenced by it. The very design of the draft, with forward-looking competency evaluations, multiple levels of review and input

from numerous individuals, militates against such an inference. Nor has plaintiff adduced evidence suggesting that other, non-Fundamentalist employees were favored. Thus, he cannot point to any implausibilities or inconsistencies in defendant's proffered nondiscriminatory reason nor has he offered sufficient evidence from which a factfinder could conclude that discrimination was more likely than not a motivating factor in his nonselection in the technical draft. *See Fuentes,* 32 F.3d at 765.

The circumstances surrounding Slowick are slightly different. Slowick had read *Theory C* and presumably knew of plaintiff's religious beliefs. Moreover, in changing his mind about drafting plaintiff, Slowick credited Sharbaugh's negative comment that plaintiff's management programs had not been well received. Dkt. no. 13, Exh. 23, at 32. Slowick testified, however, that he was unfamiliar with those management theories, "had no idea" that they involved Christian principles and had forgotten about the religious content of plaintiff's book. *Id.* at 33–35. He defended his decision not to select plaintiff by voicing concern that plaintiff was not a team player or a Homer City incumbent, and that it did not "make sense to draft [plaintiff] into [a] situation ... [where] he'd have to work with people ... that were not interested in having him there." *Id.* at 25, 36, 38. Sharbaugh, for his part, testified that he opposed plaintiff's selection because he was a nonincumbent, which would mean subjecting an existing station employee to layoff. Dkt. no. 13, Exh. 21, at 12, 16. He was unaware that plaintiff had written on and attempted to implement so-called Christian-based management principles. *Id.* at 20–21. Finally, the job for which Slowick considered drafting plaintiff was ultimately never funded as a separate position; instead, its duties devolved upon another, existing employee.

This evidence is not sufficient to support a rational finding that plaintiff was discriminated against because of his religion. Plaintiff has come forward with no evidence of anti-Christian animus [5] on the part of the

---

**5.** To the extent that plaintiff is alleging discrimination against Fundamentalist Christians in particular as opposed to all Christians in general, I note that plaintiff has been consistently unable to define, whether theologically, denominationally or culturally, precisely what constitutes Christian

Fundamentalism, other than his assertion that "Fundamentalists believe the Bible is the Word of God." Dkt. no. 13, Exh. 15, at 62. He himself testified that the difference between Fundamentalist beliefs and those of three other Protestant

defendant and he offers no more than speculation about the connection between his religious beliefs, defendant's knowledge of them and his nonselection in the drafts. Without more, plaintiff has not "meaningfully thrown into question" Slowick's proffered nondiscriminatory reason. *See Fuentes,* 32 F.3d at 765.

## B. *Age Discrimination*

### 1. *Direct vs. Circumstantial Evidence*

Plaintiff first argues that he has direct evidence of age-based discrimination such that application of the *McDonnell Douglas* burden-shifting formula is unnecessary. Dkt. no. 19, at 14–18. He purports to find this evidence in statements made by Herbein about the need for young blood and employees in better physical shape, and by Hafer that younger employees were more energetic. To apply the proper analytical framework, I must first identify the true nature of plaintiff's evidence.

 For a statement to constitute direct evidence, it must reflect a discriminatory animus on the part of a decisionmaker. *Armbruster,* 32 F.3d at 778. The general rule was distilled from Justice O'Connor's concurrence in *Price Waterhouse:*

> Stray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard … What is required is … direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion in reaching their decision.

*Armbruster,* 32 F.3d at 778 (quoting *Price Waterhouse,* 490 U.S. at 276 (O'Connor, J., concurring)). Statements made at a time remote from the decision itself are also afforded less weight. *See Ezold v. Wolf, Block Schorr, and Solis–Cohen,* 983 F.2d 509, 545 (3d Cir.1992).

 These age-related comments constitute only circumstantial evidence. Herbein, as the Vice–President of Station Operations at Penelec, signed plaintiff's annual reviews and was instrumental in his 1987 demotion. During the 1995 reorganization, as the Produce Energy Process Owner, he oversaw all Genco staffing decisions. In addition, it was Herbein who refused to authorize the position Slowick initially intended to offer plaintiff before the second draft. Thus, while Herbein did not directly make decisions affecting plaintiff, he was in a position to greatly influence those who did.

Prior to the draft, Herbein held station meetings to discuss the reorganization. Plaintiff, along with Barron and Gritzer, attended such a meeting at Conemaugh in the summer of 1995. Dkt. no. 13, Exh. 14, at 154. Both plaintiff and Barron recall that Herbein made a statement to the effect that he might get in trouble for saying it, but defendant needed to get fresh young blood in the company in order to remain competitive. *Id.* at 156; Dkt. no. 12, Exh. 8, at 58–59.

Plaintiff also viewed a tape of a different meeting from June 1995 during which Mr. Hafer allegedly said that younger employees are more energetic. Dkt. no. 13, Exh. 15, at 31. Plaintiff alleges that other employees told him that Hafer made similar comments at other meetings. *Id.* at 31–32.

Neither Herbein or Hafer made selection decisions directly, nor did they participate in the initial ranking process. In addition, their statements were made several months before the drafts. Thus, they do not constitute direct evidence of age discrimination. Nevertheless, because Barron and Gritzer may have understood those statements as reflecting company goals or policy, they are relevant circumstantial evidence. *See Brewer,* 72 F.3d at 333 ("a supervisor's statements about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision and may be used to

---

denominations (Baptist, Presbyterian and Episcopal) is "a very fine distinction[,]" *id.* at 63, and admitted that he has belonged to a non-Fundamentalist, Presbyterian congregation for forty years, *id.* at 82–83. He also admitted that he

told only one Penelec employee that he was specifically a "Fundamentalist Christian," a subordinate named Bill Bertres, who shared the same beliefs and has suffered no adverse employment consequences as a result. *Id.* at 81–82.

build a circumstantial case of discrimination"). *See also Lockhart v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir.1989) ("when a major company executive speaks, people listen"). Accordingly, I will consider whether the statements constitute probative evidence of pretext in the third stage of the *McDonnell Douglas* analysis.

### 2. Analysis of Plaintiff's Age Discrimination Claim

 Plaintiff, who was forty-three years old at the time of the 1995 reorganization, has presented a prima facie claim for age discrimination and has identified Klavuhn and Brandick as favored younger employees. Once again, defendant asserts that plaintiff was not chosen because, based on his declining performance and disinterested attitude, other candidates were more attractive.

Plaintiff offers three pieces of circumstantial evidence to cast doubt on defendant's explanation. First, he points to the discrepancy between Barron's initial rankings and the group's re-ranking and subsequent reliance upon subjective qualifications, which allegedly resulted in the selection of younger employees. Specifically, Brandick (24) and Long (37) were moved up while Jacoby (46), Lewis (45) and plaintiff (43) were moved down. Second, plaintiff offers the comments of Herbein and Hafer as evidence of a discriminatory atmosphere that harmed the chances of older employees by improperly influencing the selectors.

Plaintiff's circumstantial evidence is sufficient, albeit barely, to rebut defendant's articulated nondiscriminatory reason that it chose better-suited, not younger, candidates. The statistics, although "of little if any value[,]" *Keller*, 130 F.3d at 1112, appear to favor plaintiff's position that age was a factor. Of the thirteen engineers retained at Conemaugh, eight were over forty years of age, but of those unselected, all were over forty. Moreover, defendant's age analysis reveals that of the sixty-two mechanical engineers in the technical draft, the average age of those selected was forty-two and of those not selected, forty-six.

The drafting process turned on highly subjective evaluations. Thus, it is largely governed by *Ezold*. When Attorney Ezold sued for gender discrimination after being denied

partnership, her employer cited poor legal analysis skills as the basis for the denial. The court noted that "barring discrimination, a company has the right to make business judgments on employee status, particularly when the decision involves subjective factors deemed essential to certain positions." *Id.* at 527. While subjective judgments are not insulated from review, a court should not simply second-guess them, but instead focus on the qualification found lacking and determine if non-protected employees were treated more favorably. *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 500 (3d Cir.1995) (*citing Ezold*, 983 F.2d at 528).

Barron testified that Klavuhn was chosen as the candidate better suited for the future. *See* dkt. no. 12, Exh. 8, at 41. He felt that plaintiff no longer wanted to be a station engineer and had "leveled off or actually gone down" in performance and motivation, while Klavuhn had recently gotten "her life in better order and was constantly improving." *Id.* at 42. Gritzer testified that Klavuhn was "a fairly highly motivated person, willing to do whatever it takes to get the job done." Dkt. no. 12, Exh. 11, at 63. She was seen "as a person who was the future of Genco," *id.*, while plaintiff was not perceived as representing that future, because of his lack of motivation, commitment and desire to be a station engineer. *Id.* at 63–64. The criticisms Barron and Gritzer leveled against plaintiff track those earlier voiced by Lantzy's 1986 and 1987 reviews, which noted a similar failure to make forward progress in his job.

That the various decisionmakers all noted similar shortcomings in plaintiff's performance and attitude weakens any inference that they acted with discriminatory animus, but does not eliminate it. Of course, it is axiomatic that the mere fact that Plaintiff personally disagrees with those assessments will not suffice to create a genuine issue of material fact, especially where he has not offered specific, probative evidence to support his disagreement. *See Fuentes*, 32 F.3d at 766. Here, plaintiff has presented no witnesses or documents other than his own resume to attest that he was better qualified than Klavuhn (or even equally qualified), and

no evidence that younger persons with his type or quantity of performance deficiencies were treated more favorably.

In *Brewer,* the plaintiff-salesman offered testimony that the employer did not really emphasize the areas of job performance that it asserted as justifying plaintiff's discharge, that he excelled in the critical area of salesmanship and had, in fact, just received a bonus. The court stated that plaintiff's "deficiencies pale beside his consistently good sales performance, inexplicably unaccounted for in his supervisor's negative evaluations. A fact finder could find it implausible that Quaker State would have fired [plaintiff] when he was successful in the sole area identified by Quaker States's own performance incentive program—sales." *Id.* 72 F.3d at 332.[6]

Likewise, in *Keller,* the plaintiff executive failed in his primary duty of acquiring $1.5 billion in financing, was denied a promotion and later terminated. Although plaintiff alleged that the employer knew this failure was due to circumstances beyond his control, the record suggested that there were ways by which plaintiff could have secured the financing. The court, noting defendant's particularly strong reason to discharge plaintiff, held that a reasonable factfinder could not find that defendant's dissatisfaction with plaintiff's performance was insincere. *Id.* 130 F.3d at 1110.

This record, as already stated, contains no evidence of the type of pretext found in *Brewer* and *Waldron.* By all accounts, plaintiff was evaluated based on legitimate job requirements. Even so, while plaintiff's evidence of his superior qualifications and disparate treatment in comparison with any given employee is either weak or nonexistent, I conclude that he has adduced sufficient evidence of age-related bias on the part of top management to survive summary judgment.

In *Brewer,* the CEO of the defendant company, Jack Corn, was quoted as referring to "two of our star young men in their mid–40s. That age group is our future." *Id.* 72 F.3d at 333. The Third Circuit concluded that this statement was "relevant evidence of age discrimination." *Id.* at 334. It opined:

> Quaker State claims that Corn's statement should not be considered evidence at all because it is too innocuous. The statement that the mid–40's age group is the company's future may indeed be considered a truism—the future of any business lies with its relatively young employees.... While a factfinder could find Corn's comment too abstract to evince age discrimination, it may also be considered by the jury as evidence of the corporate culture against which the employment decision to discharge Brewer was made, and circumstantial evidence of age discrimination.

*Id.* Similarly, in *Waldron,* plaintiff's supervisor urged him to lose weight to look younger, then terminated him five months later. The court held that, while the comment "standing on its own ... would likely be insufficient to demonstrate age-related animus[,][it] may be entitled to some weight when considered by the jury...." 56 F.3d at 502.

In *Keller,* however, the court held that a superior's question whether plaintiff was getting too old for the job, and, if so, to hire some younger people, was not sufficient evidence to suggest that age discrimination was more likely than not a determining factor. In that case, which did not involve a reorganization or downsizing, the comment was made months before the decision was made to discharge plaintiff and did not implicate whether plaintiff should be discharged but only whether additional staff should have been hired to help him travel to meet with bankers. Although probative, that statement

---

6. Likewise, in *Waldron,* the nonmoving plaintiff undercut the employer's nondiscriminatory reason by showing that, except in his case, the need to visit "key accounts" had never been emphasized and that, after replacing plaintiff with someone younger, the employer removed that duty from the replacement's job description. *Id.* 56 F.3d at 498–99. In addition, citing economic hardship, the employer reorganized by splitting plaintiff's position into two separate jobs, told plaintiff he was not qualified for either of them, and then terminated his employment. It then hired a much younger, "better qualified" employee to fill one of the positions and never filled the other. A few months later, the defendant recombined the two positions again, leaving the younger employee in plaintiff's old job. *Id.* at 496. The court held that this evidence permitted an inference that the "reorganization was not the reason for [plaintiff's] termination, but rather a pretext." *Id.* at 497.

alone could not prove that age was a determinative factor. *Id.* 130 F.3d at 1112.

Like Keller and Brewer, plaintiff offers the statements of Herbein and Hafer to discredit defendant's nondiscriminatory reason for not selecting him. He relies on Hafer's comment that younger employees are more energetic, and on Herbein's statement about wanting more young blood in the company in order to stay competitive. Hafer's statement falls somewhere between the innocuous statement made in *Keller* and the utterance of the CEO in *Brewer.* Standing alone, it might not constitute sufficient evidence to avoid summary judgment. Herbein's remark, however, is more troublesome because it relates directly to the reorganization and because Herbein, as the Produce Energy Process Owner, was clearly an influential figure. Barron, who was directly involved in plaintiff's nonselection, heard this remark. Dkt. no. 12, Exh. 8, at 58–60. In addition, plaintiff testified to having seen meeting minutes in which Herbein allegedly commented on older peoples' abilities. Dkt. no. 13, Exh. 15, at 33.

Missing from this picture is direct evidence that the selectors acted upon this preference for younger employees expressed in these two statements, but such evidence rarely exists in discrimination cases. Reduced to its essentials, plaintiff has made out his prima facie case and defendant has stated that likely future performance, not age, motivated his decision. Plaintiff has adduced evidence, however, that important company executives publicly expressed a bias against older workers and a desire to hire more younger employees. This quantum of evidence is barely sufficient to avoid summary judgment, but a rational jury could find that discriminatory animus more likely than not was the cause of plaintiff's nonselection, or that defendant's proffered reason is simply unworthy of credence. I conclude, therefore, that plaintiff is entitled to have a jury decide the issue and I will not usurp its role.

### C. *The Gender Discrimination Claim*

#### 1. *Direct vs. Circumstantial Evidence*

█ As with his claim of age discrimination, plaintiff points to gender-related statements which arguably constitute direct evidence of sex discrimination. First, after the technical draft, Barron told Plaintiff that he and Gritzer ranked plaintiff lower in order to "protect" Ms. Klavuhn. Dkt. no. 13, Exh. 15, at 131–32. This statement relates directly to criteria used by key decisionmakers in the technical draft, although by itself it is not probative of whether Klavuhn was "protected" because of her gender or for some other reason. It is not a stray remark, having been made in response to plaintiff's pointed inquiry about why he was not selected. Moreover, it was temporally close to the decision, coming only days after the draft.

Second, plaintiff alleges that Barron, Gritzer and a Mr. Savukas, a senior personnel official, made gender-related statements about how administrative positions would be filled. After the first draft, plaintiff sought a number of positions, all of which were ultimately awarded to women. *Id.* at 110–16. In particular, he vied for an administrative superintendent position at the Conemaugh generating station. Plaintiff alleges that Barron repeated to him Gritzer's statement that they gave plaintiff and another man interviews "just for show, and that the position had to be filled by a female." *Id.* at 115. In addition, Savukas allegedly told plaintiff that "one of the qualifications for the job was that you had to sit down to piss." *Id.* at 116.

Plaintiff claims that Barron made this statement when "they"—apparently Barron and Gritzer—were filling the administrative superintendent position. *Id.* at 115. Although the record is not entirely clear, it appears that Savukas, while not directly involved, was a "senior company official" in a position of influence. *See id.* at 114. These statements, referring to job qualifications and the interviews, relate directly to the selection process and were made in response to plaintiff's questions at or near the time of the second draft.

Because these statements, taken as a whole, reveal that gender was considered, they too are best characterized as direct evidence, at least of the mental processes that animated the decisionmakers when they selected Klavuhn and Brandick over plaintiff.[7] Thus, on his gender discrimination

---

**7.** Plaintiff has not shown that he was qualified for the position of administrative superintendent, so these comments are relevant only as evidence of the actor's mindsets and practices generally.

claim, plaintiff has adduced direct evidence and the *Price–Waterhouse* framework applies. *See Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1098 (plaintiff need not chose between the *McDonnell Douglas* and *Price–Waterhouse* paradigms; rather it is for the district court to determine which applies to individual claims) (quoting *Armbruster*, 32 F.3d at 782 n. 17).

### 2. Analysis of Plaintiff's Gender Discrimination Claim

 Plaintiff has presented a prima facie case of gender discrimination, and specifically identified Klavuhn and Brandick as favored female employees. He offers direct and circumstantial evidence regarding selection of Klavuhn, and circumstantial evidence regarding Brandick. In these circumstances, *Price–Waterhouse* switches the burden to defendant to show that, even without consideration of gender, plaintiff would not have been selected. The claim regarding Brandick follows the *McDonnell–Douglas* burden-shifting framework.

As a male, plaintiff is protected against the reverse discrimination he alleges permeated the reorganization process. *Johnson v. Transportation Agency, Santa Clara County*, 480 U.S. 616, 626, 107 S.Ct. 1442, 94 L.Ed.2d 615 (1987). Here, plaintiff offers the direct evidence that Barron and Gritzer told him that they manipulated the rankings in the technical draft to protect Ms. Klavuhn, Dkt. no. 13, Exh. 15, at 49, and that Barron told him that "picks in the upcoming draft wouldn't be made based on performance[ a]nd ... there's going to be a lot of good people hurt." *Id.* at 36. Barron also stated in his deposition that gender was a factor in selecting Klavuhn over plaintiff. Dkt. no. 12, Exh. 8, at 44–47. Accordingly, defendant will have to prove that plaintiff would not have been selected even absent discrimination, a showing it has not yet conclusively made.

From the standpoint of pretext analysis, Klavuhn was consistently rated lower than Plaintiff going into the draft, and although the rankings were not binding, a jury could

infer that Barron and Gritzer did not really value her abilities as highly as they do now in this litigation. This would support an inference that they are masking a company policy to retain women in preference to men. Under either evidentiary standard, then, granting summary judgment would be improper because a genuine issue of material fact exists regarding defendant's motivation for choosing Klavuhn.

The reranking process also moved Brandick up three positions. A jury could infer that this was motivated, not by actual merit, but by a perceived need to make her selection appear more credible. Comments about "good people getting hurt" and the need to protect Klavuhn are relevant in this context because they suggest that gender was a factor during the drafts. In contrast to Klavuhn, the record contains little about why Brandick was chosen. Thus, this circumstantial evidence weakens defendant's explanation that she was the better candidate and could support a finding of pretext.[8]

Plaintiff also has identified "developmental positions" reserved to fast-track females into positions for which they were not yet qualified, and e-mails from upper level management referring to the company's need for diversity, as relevant circumstantial evidence. Dkt. no. 13, Exh. 15, at 32, 43. He also identifies numerous other positions filled by women he claims were less qualified. *Id.* at 110–111. Regarding the administrative superintendent position, plaintiff testified that he was told by Barron that the position was reserved for a female and by Savukas that being female was the requisite qualification. *Id.* at 114–116. Viewing the record in plaintiff's favor, this evidence also suggests that gender discrimination may indeed have worked against him.

### 3. Defendant's Affirmative Action Plan

Defendant has produced portions of an affirmative action plan that was in place during the 1995 reorganization, which it cites as authority for lawfully considering gender as a

---

**8.** This analysis assumes, of course, that Brandick's duties were in the area of mechanical engineering and that plaintiff was qualified to perform her job. If she functioned instead as a chemical engineer, then plaintiff is not qualified and no prima facie case arises from the position awarded her, as discussed *supra*.

factor in its decisions. Defendant claims that its human resources department created the plan pursuant to its obligation as a government contractor or subcontractor. Dkt. no. 12, Exh. 7, at 15. The plan document reproduced in the record, however, contains a scant two pages of employment statistics and numerical goals, presented without interpretation or analysis. Dkt. no. 12, Exh. H to Exh. 7. Plaintiff asks the court to disregard reliance on the plan because defendant has not made the showing required by *Johnson,* 480 U.S. at 630, that there was a "conspicuous imbalance in traditionally segregated job categories."

Although the plaintiff bears the ultimate burden of proving the plan's invalidity, the defendant bears the initial burden of producing the plan, presumably in document form. *Id.* at 626; *accord Taxman v. Board of Educ.,* 91 F.3d 1547, 1556 (3d Cir.1996) (in banc), *cert. dismissed,* —— U.S. ——, 118 S.Ct. 595, 139 L.Ed.2d 431 (1997). Here, defendant did not provide the entire plan, and the excerpts it did provide are wholly insufficient for this court to make any serious analysis of whether there was a conspicuous imbalance in plaintiff's discipline to support the plan's adoption. Moreover, plaintiff cannot be expected to prove the invalidity of the plan without seeing it in its entirety. Accordingly, I will not consider the legal effect, if any, of defendant's affirmative action plan, at this stage of the proceedings. Defendant may, if it chooses, file a renewed motion for summary judgment if it believes there is sufficient evidence concerning the plan to support such a ruling.

### IV. CONCLUSION

For the foregoing reasons, I will grant summary judgment to defendant on plaintiff's religious discrimination and PHRA claims, and deny summary judgment on his claims of age and gender discrimination. An appropriate order follows.

### *ORDER*

AND NOW, this 17th day of April 1998, upon consideration of defendant's motion for summary judgment, dkt. no. 10, and the parties' arguments relative thereto, it is hereby ORDERED and DIRECTED that:

1. The aforesaid motion is GRANTED IN PART and DENIED IN PART;

2. Plaintiff's claim for religious discrimination is DISMISSED WITH PREJUDICE;

3. Plaintiff's state law claim under the PHRA is DISMISSED WITH PREJUDICE;

4. Plaintiff's claims for age and gender discrimination shall proceed;

5. The parties shall file a stipulation substituting the proper party as defendant on or before April 27, 1998;

6. A pretrial conference shall be held in my Johnstown chambers on *Thursday, May 14, 1998, at 10:00 AM, 319 Washington Street, Room 104, Johnstown, Pennsylvania.*